**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **COMMERCIAL CREDIT GROUP INC.** | § | |
| **Plaintiff** | § | **Civil Action No. 7:22-cv-00083** |
| | § | |
| **vs.** | § | |
| | § | |
| **ZAID CARRIERS LLC** | § | |
| **Defendant** | § | |

**PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT**

TO THE HONORABLE RICARDO H HINOJOSA, UNITED STATES DISTRICT JUDGE:

Comes now Plaintiff, Commercial Credit Group Inc. ("Plaintiff"), and respectfully moves the Court to enter default judgment against Defendant Zaid Carriers LLC ("Defendant") pursuant to Fed. R. Civ. P. 55(b).

<u>A. Background</u>

1.    Plaintiff sued Zaid Carries LLC for possession of equipment due Defendant's failure to pay all amounts due under certain contracts between the parties. Prior to the date of this suit, Zaid Carriers LLC entered into several Negotiable Promissory Note and Security Agreements with Plaintiff, including those dated August 2, 2017, January 24, 2018, July 23, 2018 and September 6, 2018, respectively (collectively, the "Agreements"). See Exhibits A-1, A-2, A-3 and A-4, each incorporated herein by reference.

2.    Under the terms of the Agreements, Plaintiff financed Zaid Carriers LLC's purchase of certain commercial vehicles and trailers, more specifically described by the Agreements. *Id.*

3.    As consideration Zaid Carriers LLC promised to make payments as described by the Agreements and granted Plaintiff security interests in the vehicles and trailers as well as a blanket lien in all assets. *Id.*

4.    The Agreements have since gone into default for nonpayment. *See* Exhibit A, incorporated herein by reference.

5.    Despite demand, Zaid Carriers LLC has failed to make the payments and has failed to surrender all of the vehicles and trailers to Plaintiff. *Id*.

6.    On July 6, 2022, Plaintiff filed its Original Complaint in this suit.

7.    On March 16, 2022, Plaintiff filed its Ex Parte Application for Writ of Sequestrations against Zaid Carries LLC seeking an order from this Court directing that one or more Writs of Sequestration be issued commanding the U.S. Marshal or another person appointed by the Court to take possession the units that remained unrecovered by Plaintiff (the "Outstanding Equipment") as Plaintiff perfected its liens on the Outstanding Equipment by having its liens noted on the titles to that equipment, attached hereto and incorporated herein by reference as Composite Exhibit A-5.

8.    On June 10, 2022, this Court issued an Order for Writ of Sequestration granting Plaintiff's Application and ordering the U.S. Marshals to seize and sequester the following Outstanding Equipment:

- 2010 Utility 53" Refrigerated Trailer with a Carrier Refrigeration Unit;
- 2018 Utility VS2RA 53" refrigerated Trailer with a Carrier X7300 Refrigeration Unit;
- 2019 Kenworth T680 Cummins Xl5 450hp Engine, Fuller 15810S-EC3 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" Raised Roof Sleeper;
- 2013 Peterbilt 389 Sleeper Tractor 70" Ultra Sleeper with a Cummins 500hp Engine, 18 speed transmission and all aluminum wheels; and
- 2011 Utility Refrigerated Trailer 53"x102" Refrigerated Trailer with a thermos King SB310 Refrigeration Unit.

9.    The U.S. Marshals subsequently seized the Outstanding Equipment. Attached as Exhibit B is the U.S. Marshals' Process Receipt and Return for the writ of sequestration.

10.    Zaid Carriers LLC was served with summons and a copy of Plaintiff's Original Complaint on Defendant via its Manager, Maribel Diaz, on July 25, 2022. Attached as Exhibit

C are copies of the summons and proof of service certifying that process was served on Zaid Carriers LLC. The deadline for Zaid Carriers LLC to file an answer in this case was August 15, 2022. However, Zaid Carriers LLC has not filed an answer or made any appearance.

11.    Zaid Carriers LLC is not a member of the United States military. Attached as Exhibit D is an affidavit regarding each individual defendant's military status.

B. Argument

12.    On a motion for default judgment under Rule 55(b) of the Federal Rules of Civil Procedure, the Court accepts as true the facts alleged in the complaint: "[B]y defaulting, the [defendant is] deemed to have 'admit[ted] the plaintiff's well-pleaded allegations of fact' for purposes of liability." *Coton v. Televised Visual X-Ography, Inc.*, 740 F. Supp. 2d 1299, 1307 (M.D. Fla. 2010) (quoting *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987)); *Tyco Fire & Sec., LLC v. Alcocer*, 218 Fed. App'x 860, 863 (11th Cir. 2007). If the admitted facts establish the defaulting defendant's liability, the plaintiff is entitled to relief against that defendant. *See Shandong Airlines*, 650 F. Supp. 2d at 1206; *Tyco Fire & Sec., LLC v. Alcocer, 218 Fed. App'x 860, 863 (11th Cir. 2007)*. Pursuant to Fed. R. Civ. P. 54(c), the relief awarded "must not differ in kind from, or exceed in amount, what is demanded in the [complaint]." *See Rasmussen v. Cent. Fla. Council Boy Scouts of Am., Inc.*, No. 10-12238, 2011 WL 311680, at *2 (11th Cir. 2011).

13.    Plaintiff's claim is for possession of the Outstanding Equipment and proven in writing by the instruments filed with Plaintiff's Original Complaint and the Affidavit in Support of Default Judgment attached hereto as Exhibit A.

14.    Upon default of the Agreements, Plaintiff is entitled to take possession of the Equipment. Plaintiff asks the Court to issue an order that Plaintiff is entitled to immediate

possession of the Oustanding Equipment and requires Zaid Carriers LLC or any other person in possession of any portion of the Outstanding Equipment to surrender the Outstanding Equipment to Plaintiff and permit Plaintiff access to pick up the Outstanding Equipment.

C. Prayer

15.    For these reasons, Plaintiff asks the Court to sign a default judgment against Defendant, granting Plaintiff immediate possession of the Outstanding Equipment and requiring Zaid Carriers LLC or any other person in possession of any portion of the Outstanding Equipment to surrender the Outstanding Equipment to Plaintiff and permit Plaintiff access to pick up the Outstanding Equipment

Respectfully submitted,

By: */s/ Jared A. Rougeau*
Jared A. Rougeau, Attorney-In-Charge
TX State Bar No. 24093076
Southern District of Texas Bar No. 2961730
jar@replevin.com
WRIGHT LAW GROUP, PLLC
12333 Sowden Rd, Ste. B, PMB #84356
Houston, TX 77080-2059
(713) 936 – 9574 (Tel)
(713) 936 – 9574 (Fax)
COUNSEL FOR PLAINTIFF

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **COMMERCIAL CREDIT GROUP INC.** | § | |
| **Plaintiff** | § | **Civil Action No. 7:22-cv-00083** |
| | § | |
| **vs.** | § | |
| | § | |
| **ZAID CARRIERS LLC** | § | |
| **Defendant** | § | |

<u>AFFIDAVIT IN SUPPORT OF DEFAULT JUDGMENT</u>

| | |
|---|---|
| THE STATE OF ILLINOIS | § |
| | § |
| COUNTY OF DUPAGE | § |

BEFORE ME, the undersigned authority, personally appeared Mike Smith, being by me duly sworn, deposed as follows:

1.  "My name is Mike Smith. I am over the age of eighteen (18), and have never been convicted of a felony or other crime of moral turpitude. I am of sound mind, capable of making this affidavit, and am personally acquainted with the true and correct facts herein stated or asserted.

2.  I am a Regional Vice President of Commercial Credit Group Inc. ("Plaintiff"). Because of my position, and because of my specialized training and experience, I am familiar with the customs, practices, and usages within the equipment financing industry.

3.  Zaid Carriers LLC is in default of the certain Negotiable Promissory Note and Security Agreements dated, respectively, August 2, 2017, January 24, 2018, July 23, 2018, and September 6, 2018 and attached hereto as Exhibits A-1 through A-4 (the "Agreements") for failure to make payments. Despite demand, Zaid Carriers LLC has failed to make payments and surrender all the equipment that is the subject of the Agreements to Plaintiff.

4.  Plaintiff perfected its liens on the equipment by having its liens noted on the titles to that equipment, attached hereto and incorporated herein by reference as Composite Exhibit A-5

5.  As a result of Zaid Carriers LLC's breach of the Agreements, Plaintiff was forced to employ the Wright Law Group, PLLC to file this suit.

6.  The records attached hereto as Exhibits A-1 through A-5 are kept by Plaintiff in the regular course of business, and it was the regular course of business of Plaintiff for an employee or representative of Plaintiff, with knowledge of the act, event, condition, opinion, or diagnosis that was recorded, to make this record or to transmit the information to be included in this record. The record was made at or near the time or reasonably soon after the act, event,

condition, opinion, or diagnosis that was recorded. The records attached hereto as Exhibits A-1 through A-5 are the originals or exact duplicates of the originals."

Further affiant sayeth not.


_____
Mike Smith


SIGNED and SWORN TO before me this the 12 day of October , 20 22 .




CRYSTAL LYNN NOWACZYK
OFFICIAL SEAL
Notary Public, State of Illinois
My Commission Expires
June 29, 2026


_____
Notary Public in and for State of Illinois

# NEGOTIABLE PROMISSORY NOTE

# EXHIBIT A-1

**$186,620.00**
Total Amount of Scheduled Note Payments

**August 02, 2017**
Date

**Zaid Carriers LLC**
("MAKER")

For value received, the undersigned (hereinafter referred to as "Maker"), jointly and severally if more than one, irrevocably and unconditionally promises to pay to the order of Commercial Credit Group Inc., its successor or assigns ("Holder") at such place as the Holder hereof may from time to time appoint, the sum of <u>One Hundred Eighty-Six Thousand Six Hundred Twenty And 00/100</u> Dollars ($186,620.00) in consecutive monthly installments as follows:

  1   Installment(s) each in the amount of $14,000.00 Followed By
  60  Installment(s) each in the amount of $2,877.00

The first Installment shall be due on 08/02/2017 . The second Installment shall be due on 09/15/2017 and each of the remaining consecutive monthly Installments shall be due on the same date of each month thereafter until the indebtedness under this Note is paid in full. The Total Amount of Scheduled Note Payments includes pre-computed interest (at the "non default interest rate"). Maker on demand shall pay a late charge of 5% of any installment that has not been fully paid prior to the seventh day after its due date ("Late Charge") and, upon Maker's default or after maturity, whether by acceleration or otherwise, to the extent permitted by applicable law, interest on the entire unpaid balance (excluding accrued and unpaid interest) at the maximum lawful rate permitted by law not to exceed eighteen percent (18.0%) per annum (the "Default Rate") until this Note is paid in full, plus all collection and other charges, and if placed in the hands of an attorney for collection, attorneys' fees, costs and expenses. Unless prohibited by applicable law, during any period of time when Maker is in default under the terms of this Note, Maker shall pay interest on the unpaid principal amount outstanding from time to time at the maximum lawful daily rate, not to exceed the Default Rate, in place of the non-default interest rate payable hereunder, until the default is cured. In no event shall any late charge or the Default Rate charged hereunder exceed any maximum permitted by law. Interest shall be computed on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate to exceed the maximum rate allowed by applicable law, in which case such calculation shall be computed on the basis of a 365 day year.

If any payment is not made when due, or if there is a default by Maker under any present or future agreement with Holder or a default of any guarantor of Maker's obligations under this Note, all remaining payments shall, at the option of the Holder, without notice, become immediately due and payable, and the unpaid balance shall bear interest at the Default Rate until paid in full. All installments and other sums received by Holder shall be applied first to interest, late charges, costs, fees and expenses, and then to principal hereunder.

Maker, any endorsers and any other persons obligated hereon each: (a) agree that the Holder may, without limit, grant to any one or more of them extensions of the time for payment of this Note and/or the maturity of any payment or payments, in whole or in part; (b) waive presentation for payment, demand for payment, notice of non-payment or dishonor, protest and notice of protest, notice of default and/or dishonor, and notice of the intent to accelerate and/or acceleration of the indebtedness evidenced hereby; (c) hereby waive the benefits of any statute of limitations with respect to any action to enforce, or otherwise related to, this Note; (d) agree that the failure or delay to perfect or continue the perfection of any security interest in any property or collateral which secures the obligations of the Maker or any endorser or other person obligated hereon, or to protect the property or collateral covered by such security interest, if any, shall not release or discharge them or any of them; (e) agree this Note is made and shall be construed under the laws of the State of Delaware; and (f) agree all exemptions and homestead laws and all rights thereunder are hereby waived to the extent permitted by law; (g) agree that all amounts due hereunder are absolutely due and owing and are not subject to any claim, counterclaim, or set off of any kind, and hereby waive any claim(s) whatsoever each may have against Holder, whether known or unknown, as of the date of this Note; (h) agree that Maker may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder's right of recourse against Maker, all endorsers, guarantors and other parties liable on this Note, which rights are hereby expressly reserved. Holder may settle with, grant forbearance to, or release any Maker, endorser, guarantors or other parties liable on this Note without notice, and any such settlement, forbearance, or release shall not operate to release any other person or party liable hereunder; and (i) agree that Maker's obligations hereunder shall be secured by any security agreement, mortgage, deed of trust or pledge executed by Maker in favor of Holder, whether now existing or hereafter executed.

In the event that any one or more of the provisions of this Note shall, for any reason be held to be invalid, illegal or unenforceable, the same shall not affect any other provision of this Note and the remaining provisions of this Note shall remain in full force and effect. No failure by Holder to exercise, and no delay in exercising any right or power hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder of any right or power hereunder preclude any other or further exercise thereof, or the exercise of any other right or power. No waiver or modification of any of the terms or provisions of this Note shall be valid or binding unless set forth in a writing signed by a duly authorized officer of Holder, and then only to the extent specifically set forth therein.

As used in this Note, the term "Holder" includes any future holder of this Note. Holder and its assignees may assign this Note, in whole or in part, without notice to Maker, and upon such assignment Maker agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker may have against Holder, whether arising hereunder or otherwise. All of the rights, remedies, options, privileges and elections given to the original Holder hereunder shall inure to the benefit of any assignee or holder of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of, and shall bind the representatives, successors and assigns of the respective parties.

MAKER, AND ANY ENDORSER HEREOF AGREE TO THE EXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN MECKLENBURG COUNTY NORTH CAROLINA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSSCLAIMS ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS NOTE, WITH THE SOLE EXCEPTION THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF ANY COLLATERAL SECURING THIS NOTE OR ANY OTHER ASSETS OF ANY MAKER, ENDORSER OR GUARANTOR HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF THE HOLDER, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE ANY MAKER, ENDORSER OR LOCATED. MAKER AND ANY ENDORSER HEREOF EACH WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT IN ACCORDANCE HEREWITH. MAKER AND ANY ENDORSER EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSSCLAIMS AND SETOFF OR RECOUPMENT CLAIMS ARISING EITHER DIRECTLY OR INDIRECTLY BETWEEN OR AMONG THEM AND/OR INVOLVING ANY PERSON OR ENTITY CLAIMING ANY RIGHTS ACQUIRED BY, THROUGH OR UNDER ANY PARTY AND FURTHER WAIVES ANY AND ALL

RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES.

Maker may, subject to the terms and conditions contained herein  prepay this Note in full or in part at any time, provided Maker shall: (i) give five days prior written notice to Holder specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest, late charges, and other charges accrued and/or due to Holder through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to the sum of .00167 of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of the voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid but not more than the maximum permitted by law. The principal amount of any voluntary partial prepayment shall be applied in any manner acceptable to the Holder in the Holder's sole discretion including to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes. If more than one party signs this Note as Maker, the obligations of each of them shall be joint and several. Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker and Holder, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no event, whether by reason of demand for payment or acceleration of maturity or otherwise, shall the interest contracted for, charged or received by Holder exceed the maximum amount permitted under applicable law. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise been earned on the date of such acceleration, and Holder does not intend to charge or collect any unearned interest in the event of acceleration. If, from any circumstance whatsoever, interest would otherwise be payable to Holder in excess of the maximum lawful amount, the interest payable to Holder shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal, to the extent permitted by applicable law, to other obligations of the Maker owing to Holder, as Holder may determine, and thereafter any such excess shall be refunded to Maker. All interest paid or agreed to be paid to Holder shall, to the extent permitted by applicable law, be amortized, prorated, and allocated throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest here on for such full period shall not exceed the maximum amount permitted by applicable law.  This paragraph shall control all agreements between Maker and Holder.

Maker hereby authorizes Holder to disclose to third-parties certain financial information relating to Maker which Holder has obtained or will hereafter obtain including but not limited to payment histories, balances and due dates.

THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES.  THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.

The undersigned, if more than one, shall be jointly and severally liable hereunder and all provisions hereof shall apply to each of them.

**Zaid Carriers LLC**
**(Maker)**

By: _____  ___Manager___
                                              Title

_____
(Witness to Maker's Signature)

# SECURITY AGREEMENT

This Security Agreement made the 2nd day of August, 2017 by and between Zaid Carriers LLC as Debtor ("Debtor"), whose principal place of business is 1405 Encantado Circle, Mission, TX 78572 and Commercial Credit Group Inc. ("Secured Party"), whose address is 2135 City Gate Lane, Suite 440, Naperville, IL 60563 .

1.    To secure the prompt payment, performance and fulfillment of any and all Obligations (as hereinafter defined) of Debtor to Secured Party, Debtor hereby assigns, transfers, conveys, pledges, mortgages and grants to Secured Party a security interest and lien in each and every one of the goods, chattels and property described in the attached Schedule A and any and all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, in which Debtor now or hereafter has any right or interest and in any and all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing (collectively called "Collateral"). Debtor grants Secured Party a security interest in the Collateral to secure the Obligations.

2.    The term "Obligations" as used herein shall mean and include: (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by Secured Party to or on account of Debtor or which Secured Party has or will become obligated to make, grant or extend to or for the account of Debtor; and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, attorneys fees and costs and expenses hereto and/or hereafter chargeable against Debtor by Secured Party or owing by Debtor to Secured Party or upon which Debtor may be and/or has become liable as endorser or guarantor; and (c) all obligations and/or indebtedness of any and every kind of Debtor to Secured Party whether direct or indirect, whether contingent or absolute, whether matured or un-matured and whether now or in the future arising, existing, incurred, contracted or owing to Secured Party or acquired by Secured Party by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by Secured Party directly from Debtor or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (d) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing.

3.    All of the Obligations are acknowledged, affirmed and declared by Debtor to be secured by this Security Agreement. The Debtor agrees that it will fully and faithfully pay, perform and fulfill all of its Obligations. Debtor shall pay to Secured Party on demand, on any installment of the Obligations not fully paid prior to the seventh day (or such longer period as required by law) after its due date, a late charge of 5% of any such installment ("Late Charge") and, after any default or maturity, whether by acceleration or otherwise, interest on the Obligations at the rate of eighteen percent per annum (the "Default Rate") from the date of such default or maturity (whichever is earlier), until the Obligations are collected by the Secured Party in full. In addition, Debtor agrees to pay, on demand, all attorney fees, costs and expenses, collection costs and other charges incurred by Secured Party to enforce the payment and performance of Debtor's Obligations. Any interest rate, late charge, fee or other charge ("Charge") provided for in any way hereunder or under any document, note or instrument given in connection with any of the Obligations shall not in any event or contingency exceed any maximum permitted by applicable law and any such Charge shall be deemed hereby amended to such maximum amount. Any sums collected with respect to any Charge in excess of any maximum shall be applied to reduce the principal sum owing under the Obligations and any excess refunded to Debtor.

4.    Debtor further represents and warrants to Secured Party and agrees as follows: (a) Debtor is the lawful owner of the Collateral and has paid all applicable sale, use or other taxes due in connection with the sale, purchase, ownership, possession or use of the Collateral and shall indemnify Secured Party from and against any loss, cost or expense, including penalties, interest and other charges of any kind in connection with or arising from the sale, purchase, ownership, possession or use of the Collateral; (b) The Collateral is in the possession of Debtor at its principal place of business (which is Debtor's address shown above), unless a different location is specifically shown on Schedule A for any one or more items; (c) The Collateral and every part thereof is and will continue to be free and clear of all liens, attachments, levies, claims, demands and encumbrances of every kind, nature and description (except any held by Secured Party); (d) Debtor will defend the Collateral against all claims and demands of all persons and will not permit any circumstances to exist under which the Secured Party may lose its lien or lien priority on the Collateral; (e) Debtor will not sell, assign, mortgage, lease, pledge or otherwise dispose of the Collateral without the prior written consent of the Secured Party, and in the event of a sale or disposition of any item(s) of the Collateral, Debtor shall hold all proceeds therefrom in trust, and immediately deliver same to Secured Party; (f) Debtor, at its own cost and expense, will maintain and keep the Collateral in good repair, will not waste, abuse or destroy the Collateral or any part thereof and will not be negligent in the care and use thereof; (g) Debtor will not remove the Collateral from within the 48 contiguous States of the United States or its present locations without the prior written consent of the Secured Party nor change its present business locations without at least thirty days prior written notice to Secured Party; (h) At all times Debtor shall allow Secured Party or its representatives free access to and right of inspection of the Collateral, which shall remain personalty and not become a part of any realty. Nothing shall prevent Secured Party from removing all or any part of the Collateral as Secured Party, in its sole discretion may determine, from any premises to which it may be attached and/or upon which it may be located. Debtor agrees to deliver to Secured Party all appropriate waivers which Secured Party may request in its absolute discretion, in a form satisfactory to Secured Party, of owners, landlords and mortgagees of any such premises on which the Collateral may be located from time to time; (i) Debtor shall insure that (so far as may be necessary to protect the Collateral and the lien of this Security Agreement thereon) all of the terms and conditions of any leases covering the premises wherein the Collateral may be located are consistent with and will not result in a violation hereof, and Debtor shall comply with any orders, ordinances, laws or statutes of any city, state, or other entity having jurisdiction over the premises or the conduct of business thereon, and, where requested by Secured Party, will correct any defects or execute any written instruments and do any other acts necessary to more fully execute the purposes and provisions of this Security Agreement; (j) Debtor has the sole right and lawful authority to enter into this Security Agreement and if a corporation or limited liability company, the execution of this Security Agreement has been duly consented to and authorized by all of the stockholders or members of the Debtor and duly authorized by its Board of Directors or Managers as applicable. Debtor agrees to deliver to Secured Party evidence thereof satisfactory to Secured Party immediately upon request; (k) Each person signing this Security Agreement has full authority to sign for the Debtor; (l) Debtor will indemnify and save Secured Party harmless from all losses, costs, damages, liabilities or expenses, including reasonable attorneys' fees, costs and expenses, that Secured Party may sustain or incur in connection with this Security Agreement or the Obligations, including any effort to obtain or enforce payment, performance or fulfillment of any of the Obligations or in the enforcement of, or foreclosure of Collateral under the terms of this Security Agreement or in the prosecution or defense of any action or proceeding either against Debtor or against Secured Party concerning any matter growing out of or connected with this Security Agreement and/or any of the Obligations and/or any of the Collateral. The aforementioned indemnity or any other indemnity obligation under this Security Agreement shall survive termination hereof; (m) At Secured Party's request Debtor will furnish current financial statements satisfactory to Secured Party in form, preparation and content; (n) no Blocked Person has or shall acquire an ownership interest in or control of Debtor. "Blocked Person" means any person or entity that is now or at any time (i) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list; or (ii) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (iii) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Secured Party, to be a person with whom Secured Party is not permitted to extend credit to or with regard to whom, a lending relationship may result in penalties against Secured Party or limitations on a holder's ability to enforce a transaction.

5.    To secure all the Obligations under this Security Agreement, Debtor authorizes Secured Party to file one or more financing statements and/or a reproduction hereof as a financing statement, and any other lien-related forms or documents relating to the Collateral, from time to time as Secured Party deems in its sole discretion appropriate, in any jurisdiction  (and Debtor shall execute any financing statement or amendment thereto)

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

and Debtor hereby irrevocably appoints Secured Party as the true and lawful Attorney-in-Fact of Debtor, coupled with an interest, with full power in Debtor's name, place and stead to execute financing statements on Debtor's behalf and to do any and all other acts on Debtor's behalf necessary or helpful to perfect and continue perfection of Secured Party's security interest in the Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting, any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the Collateral on the attached Schedule A and/or on any documents related hereto.

6.    Debtor will insure the Collateral, at its sole cost and expenses, by maintaining an "all risks" insurance policy naming the Secured Party as additional insured and loss payee, in an amount at least equal to the full replacement value of all collateral identified in each Schedule A attached or incorporated herein and also, where requested by Secured Party, against other hazards (including but not limited to comprehensive general liability insurance), with companies, in amounts of coverage and deductible provisions, and under policies acceptable to Secured Party. Each policy shall be delivered to Secured Party and shall expressly state that insurance as to Secured Party shall not be invalidated by any act, omission or neglect of Debtor and that the insurer shall give thirty (30) days written notice to Secured Party of any alteration, termination or cancellation of the policy. Secured Party shall have the right, but not the obligation, to provide insurance for its interest and charge Debtor Secured Party's cost for such insurance, together with it or its designee's customary charges or fees associated with its insurance. Debtor hereby irrevocably appoints Secured Party as Debtor's Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto.

7.    If Debtor shall be in default in the full, prompt and faithful performance of any of the terms, conditions and provisions of this Security Agreement, Secured Party may, at its option, (but shall not be obligated to), without waiving its right to enforce this Security Agreement according to its terms, immediately or at any time thereafter, and without notice to or demand upon Debtor, perform or cause the performance of such terms, conditions or provisions, for the account and at the sole cost and expense of Debtor, which (including reasonable attorneys' fees, costs and expenses) shall be secured by the Collateral, added to the amount of the Obligations, without notice to Debtor, and shall be payable on demand with interest at the Default Rate specified in Paragraph 3 hereof.

8.    Debtor shall be in default upon the occurrence of any of the following: (a) Debtor defaults in the prompt payment, performance or fulfillment of any of Debtor's Obligations; (b) Debtor shall fail to punctually and faithfully fulfill, observe or perform any of the terms, conditions, provisions, representations and warranties contained in this Security Agreement, the Obligations, or in any present or future agreement or instrument made by Debtor and then held by Secured Party; (c) Debtor or any guarantor of any of Debtor's Obligations under this Security Agreement ("Guarantor") dies or is materially disabled, ceases to do business, becomes insolvent, declares or is determined to be a debtor under the bankruptcy code, or makes an assignment for the benefit of creditors; (d) any of the warranties, covenants or representations made by Debtor or any Guarantor to Secured Party be or become untrue or incorrect in any respect; (e) a change in the management, operations, ownership of stock or membership units or control of Debtor; (f) Secured Party at any time deems the security afforded by this Security Agreement unsafe, inadequate or at any risk or any of the Collateral in danger of misuse, concealment or misappropriation. (g) any attachment, levy or execution against Debtor or any Guarantor that is not released within 60 hours; (h) Debtor's or any Guarantor's affairs so evolve such that, in Secured Party's sole discretion, Secured Party thereby becomes insecure as to the performance of this Security Agreement or any other agreement with Debtor; (i) Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation, other encumbrance (other than Secured Party's interest), or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral or any of Secured Party's interests under this Agreement or any of the Obligations; (j) Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (k) failure of Debtor to obtain or maintain insurance on the Collateral satisfactory to Secured Party in its sole discretion; or (l) any of the Obligations, this Agreement, the security interest granted herein or any provision hereof for any reason attributable to Debtor, ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Debtor or Debtor shall deny that it has any further liability or obligation thereunder.

9.    Upon any default by Debtor, the rate of interest shall automatically increase to the Default Rate, Debtor shall immediately deliver possession of the Collateral to Secured Party, and Secured Party, without demand or notice, may exercise any of the following remedies: (a) Accelerate the maturity of and declare the entire indebtedness under all or part of Obligations immediately due and payable; (b) Take possession of all or part the Collateral, at any time, wherever it may be, and to enter any premises, with or without process of law, and search for, take possession of, remove, or keep and store the Collateral on said premises until sold, without liability for trespass nor charge for storage; (c) Sell the Collateral or any part thereof and all of the Debtor's equity of redemption therein at public or private sale, for cash or on credit, and on such terms as Secured Party may in its sole discretion elect, in such county and at such places as Secured Party may elect and without having the Collateral at the place of sale. In the event Secured Party sells all or part of the Collateral at public or private sale, then (i) Secured Party shall not be required to refurbish, repair or otherwise incur any expenses in preparing Collateral for sale but may sell its interest therein on an "AS-IS," "WHERE-IS" basis; (ii) Secured Party may bid or become the purchaser at any such sale and Debtor waives any and all rights of redemption from any such sale; (iii) Any public sale will be deemed commercially reasonable if notice thereof shall be mailed to Debtor at least 10 days before such sale and advertised in at least one newspaper of general circulation in the area of the sale at least twice prior to the date of sale and if upon terms of 25% cash down with the balance payable in good funds within 24 hours or other more favorable terms in the discretion of Secured Party; (iv) The proceeds of any public or private sale shall first be applied to the costs and expenses of Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions. and second to the payment, partly or entirely, of any of the Obligations as Secured Party may in its sole discretion elect, returning the excess, if any, to Debtor or such other party in interest as the required by law; Debtor shall remain liable to Secured Party for any deficiency plus interest thereon as provided above; (v) Any private sale shall be deemed commercially reasonable if notice thereof shall be mailed to Debtor at least 10 days before the sale date stated therein at the address indicated above, and credit given for the full price stated, less attorneys' fees costs and expenses. No action taken by Secured Party shall release Debtor from any of its Obligations to Secured Party. Debtor acknowledges and agrees that in any action or proceeding brought by Secured Party to obtain possession of any Collateral, Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Debtor and if Debtor contests Secured Party's right to possession of any Collateral in any action or proceeding, Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Debtor's unpaid Obligations to Secured Party, whichever is less. Secured Party may without prior notice to or demand upon Debtor and with or without the exercise of any of Secured Party's other rights or remedies, apply toward the payment of Debtor's Obligations (at any time owing to Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Debtor and coming into Secured Party's possession and for such purpose may endorse Debtor's name on any instrument or document payable to Debtor (whether for deposit, collection, discount or negotiation). Without notice to Debtor, Secured Party may apply such sums or change applications of sums previously paid and/or to be paid to Secured Party, to such Obligations as Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

10.    Debtor, at Secured Party's option, hereby irrevocably consents to the appointment of a receiver or keeper for the Collateral and/or all other property of Debtor, and of the rents, issued as proceeds thereof. Debtor expressly waives any right to notice or hearing in any action to recover possession of any or all of the Collateral. Any notices hereunder shall be in writing and effective when delivered in person to an officer of the party to whom addressed or mailed by certified mail to such party at its address specified herein or at such other address as may hereafter be specified by like notice by either party to the other. Reasonable notification hereunder shall be any notification given or sent at least five (5) days prior to the event for which such notification is sent. Debtor agrees that upon the request of Secured Party, after any default, to segregate and hold all or any part of the Collateral in a fiduciary capacity and to adequately maintain, service and insure said property and to protect same from use and/or abuse, all without charge to Secured Party, such fiduciary duty to terminate only upon the actual delivery of the Collateral to Secured Party. Debtor,

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

recognizing that in the event of default no remedy at law would provide adequate relief to Secured Party, agrees that Secured Party shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

11. DEBTOR HEREOF AGREES TO THE EXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN MECKLENBURG COUNTY NORTH CAROLINA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSSCLAIMS ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS SECURITY AGREEMENT, WITH THE SOLE EXCEPTIONS THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF THE COLLATERAL OR ANY OTHER ASSETS OF THE DEBTOR OR ANY GUARANTOR HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF THE SECURED PARTY, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE THE DEBTOR, OR ANY GUARANTOR, OR THE COLLATERAL AND/OR ANY OTHER ASSETS OF THE DEBTOR, OR GUARANTOR MAY BE LOCATED. DEBTOR WAIVES ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT IN ACCORDANCE HEREWITH. DEBTOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSSCLAIMS AND SETOFF OR RECOUPMENT CLAIMS ARISING EITHER DIRECTLY OR INDIRECTLY BETWEEN OR AMONG THEM AND/OR INVOLVING ANY PERSON OR ENTITY CLAIMING ANY RIGHTS ACQUIRED BY, THROUGH OR UNDER ANY PARTY AND FURTHER WAIVES ANY AND ALL RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES.

12. Secured Party may at any time, with or without exercising any of the rights or remedies aforesaid and without prior notice or demand to Debtor, appropriate and apply toward the payment of the Obligations any and all balances, sums, property, credits, deposits, accounts, reserves, collections, drafts, notes or checks coming into Secured Party's possession and belonging or owing to Debtor, and for such purposes, endorse the name of Debtor on any such instrument made payable to Debtor for deposit, negotiation, discount or collection. Such applications may be made, or any monies paid to Secured Party may be applied, without notice to Debtor, partly or entirely to such of the Obligations as Secured Party in its sole discretion may elect. In its sole discretion Secured Party may apply and/or change applications of any sums paid and/or to be paid by or for Debtor, under any circumstances, to any obligations of Debtor to Secured Party, presently existing or otherwise. The interest rates which may be provided for in any instrument evidencing one or more Obligations shall in no event, circumstance or contingency, exceed any maximum permitted by applicable law.

13. No failure to exercise, no delay in exercising, and no single or partial exercise on the part of Secured Party of any right, privilege, remedy, or power under the Security Agreement, shall operate as a waiver thereof or preclude Secured Party from exercising any other right, privilege, remedy or power under this Security Agreement whether or not Debtor is in default hereunder. No waiver of any provision of the Security Agreement shall be effective unless in writing, signed by a duly authorized officer of the party to be charged, and no amendment, supplement or other modification of the Security Agreement shall be effective unless in writing signed by each of the parties hereto. This instrument constitutes the entire agreement between the parties. This Security Agreement cannot be modified or terminated orally. Only a written instrument, signed by an officer of the Secured Party, shall be effective to modify or terminate any obligation of Debtor to Secured Party, this Security Agreement or any other agreement between the parties but only to the extent therein specifically set forth therein.

14. This Security Agreement may be assigned along with any and all Obligations, without notice to Debtor, and upon such assignment Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Debtor may have against Secured Party, whether arising hereunder or otherwise, and such assignee shall be entitled to at least the same rights as Secured Party. All of the rights, remedies, options, privileges and elections given to the original Secured Party hereunder shall inure to the benefit of any assignee, transferee or holder of this Security Agreement, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Security Agreement shall inure to the benefit of and shall bind the representatives, successors and assigns of the respective parties.

15. Some of the Collateral may be in the hands of Debtor under one or more security agreements, installment sale contracts, lease agreements, notes or other instruments which are or may be held by Secured Party and with respect to such Collateral. Secured Party by accepting this Security Agreement shall not in any manner be considered as having waived any security interest arising independently of this Security Agreement nor shall this Security Agreement be construed as adversely affecting any rights of Secured Party under any other security agreement nor as a waiver of any of the terms and provisions of any other security agreement, guaranty or endorsement in favor of Secured Party, all of which shall remain and continue in full force and effect and shall be cumulative.

16. Intending that each and every provision of this Security Agreement be fully effective and enforceable according to its terms, the parties agree that the validity, enforceability and effectiveness of each provision hereof and the obligations, rights and remedies of the Debtor and Secured Party in any way related to or arising under this Security Agreement or under one or more Obligation shall be governed by and construed in accordance with the laws of the State of Delaware (excluding its choice of law rules). If any one or more provisions hereof are in conflict with any statute or law and thus not valid or enforceable, then each such provision shall be deemed null and void but only to the extent of such conflict and without invalidating or affecting the remaining provisions hereof. This contract shall be binding upon the heirs, administrators, legal representatives and successors of the Debtor.

IN WITNESS WHEREOF, Debtor has caused these presents to be duly executed, the day and year first above written.
DEBTOR:

**Zaid Carriers LLC**
(Debtor)                    (Seal)
By: _____    Manager
                                  (Title)

_____
(Witness to Debtor's Signature)

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.                            CCG

## SCHEDULE "A"

This schedule is attached to and becomes part of that certain Security Agreement, Lease Agreement, Conditional Sale Contract or ---------- dated <u>August 02, 2017</u> between the undersigned.

### DESCRIPTION OF PROPERTY

| Quantity | Year | Manufacturer | Model | Specifications | Serial Number |
|----------|------|--------------|-------|----------------|---------------|
| 1 | 2018 | Utility | VS2RA | 53' Refrigerated trailer with a Carrier X7300 refrigeration unit (S/N: SAN91514894) | 1UYVS2532J2130710 |
| 1 | 2018 | Utility | VS2RA | 53' Refrigerated trailer with a Carrier X7300 refrigeration unit (S/N: SAN91514900) | 1UYVS2536J2130712 |

Each including all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non cash proceeds (including any rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing.

Zaid Carriers LLC  as Debtor/Lessee/Buyer

**Zaid Carriers LLC**

By: _____

# FIRST AMENDMENT
# TO SECURITY AGREEMENT

Date: <u>August 02, 2017</u>

WHEREAS, Zaid Carriers LLC  ("Debtor") has executed and delivered a certain Security Agreement of even date herewith in which Debtor granted to Commercial Credit Group Inc. ("Secured Party") security interests in Debtor's property described therein, which includes specific items of titled equipment and/or motor vehicles (the "Titled Collateral"); and

WHEREAS, Debtor hereby acknowledges that it must expediently provide to Secured Party evidence of the completion of certain requirements, such as obtaining signed VIN inspection forms, signed weight tickets, paying excise and other taxes, as well as registration and applicable fees, in order to properly title and record Secured Party's lien against the items of Titled Collateral with the Debtor's state title-issuing authority;

WHEREAS, Debtor further acknowledges that Secured Party has funded the loan secured by the Titled Collateral in reliance upon Debtor's promise herein to pay such taxes and fees to the titling authority, and timely forward to Secured Party such signed VIN inspections forms, weight tickets and other documents as are required by the titling authority to properly title and record Secured Party's lien against the Titled Collateral.

NOW, THEREFORE, for valuable consideration received to their satisfaction, Debtor agrees as follows:

1.      Within seven (7) business days of delivery of the Titled Collateral, Debtor shall deliver to Secured Party, to the attention of the Lien Department, original signed VIN inspection forms, weight tickets and any other documents required by the titling authority to properly title and record Secured Party's lien on the Certificate(s) of Title to the Titled Collateral.

2.      Within two (2) business days of Secured Party's delivery to the titling authority of applications for Certificates of Title to the items of Titled Collateral, Debtor shall deliver to the titling authority full payment for all taxes and fees required by the titling authority to issue Certificates of Title, registrations and license plates for the Titled Collateral.

3.      The Debtor's failure to: (a) timely deliver to Secured Party original signed forms and any other evidence of completion of items described above in section "1", or (b) timely pay to the titling authority all taxes and fees required by the titling authority in order for it to issue Certificates of Title for each item of the Titled Collateral, **SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER THE SECURITY AGREEMENT THEREBY ENTITLING SECURED PARTY TO ANY AND ALL LEGAL AND CONTRACTUAL REMEDIES AVAILABLE AGAINST THE DEBTOR AND ANY COLLATERAL INCLUDING, WITHOUT LIMITATION, REPOSSESSION AND LIQUIDATION OF THE TITLED COLLATERAL WITHOUT NOTICE.**

4.      This Amendment shall be considered a part of, and be construed together with, the Security Agreement of even date herewith.

IN WITNESS WHEREOF, Debtor has caused this Amendment to be executed on the date set forth above.

**Zaid Carriers LLC**

By: _____     Manager
                                                    (Title)

_____
(Witness to Signature)

## AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date: January 03, 2020

WHEREAS, Zaid Carriers LLC      as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated August 02, 2017 and payable to the order of **Commercial Credit Group Inc.**, its successors and assigns ("CCG"), with installment payments originally totaling $186,620.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Paper is $104,937.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on March 15, 2020 and on the 15th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Paper, as follows:

| 33 | Installment(s) each in the amount of | $2,877.00 | Followed By |
| 1 | Installment(s) each in the amount of | $9,996.00 | |

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Extension had never been entered into. As further consideration for CCG's agreement to the terms of this Extension, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind,, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Paper and/or this Extension, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations. Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Paper is and

will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Paper or otherwise. Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained. Any promissory note made and delivered by Obligor to CCG in connection with this Extension shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Extension shall not diminish or prejudice CCG's rights or alter CCG's position under the Paper. Except as expressly modified by this Extension, all terms, conditions and provisions of the Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Paper, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.

IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above

**Commercial Credit Group Inc.**

By: _____
                              Title

**Zaid Carriers LLC**
**(Obligor)**

By: _____
                              Title

# EXHIBIT A-2

**CCG**
Commercial Credit Group

## NEGOTIABLE PROMISSORY NOTE and SECURITY AGREEMENT (the "Note")

**$108,528.00**
Total Amount of Scheduled Note Payments

**January 24, 2018**
Date

**Zaid Carriers LLC**
**("MAKER/DEBTOR")**

For value received, the undersigned (hereinafter referred to as "Maker/Debtor"), jointly and severally if more than one, irrevocably and unconditionally promises to pay to the order of Commercial Credit Group Inc., its successor or assigns (hereinafter referred to "Holder/Secured Party") at 2135 City Gate Lane, Suite 440, Naperville, IL 60563 or such other place as the Holder/Secured Party hereof may from time to time appoint, the sum of One Hundred Eight Thousand Five Hundred Twenty-Eight And 00/100 Dollars ($108,528.00) in consecutive monthly installments as follows:

|   |   |
|---|---|
| 1 | Installment(s) each in the amount of  $6,000.00  Followed By |
| 36 | Installment(s) each in the amount of  $2,848.00 |

1.    The first Installment shall be due on 01/24/2018 . The second Installment shall be due on 03/15/2018  and each of the remaining consecutive monthly Installments shall be due on the same date of each month thereafter until the indebtedness under this Note is paid in full. The Total Amount of Scheduled Note Payments includes pre-computed interest (at the "non default interest rate"). Maker/Debtor on demand shall pay a late charge of 5% of any installment that has not been fully paid prior to the seventh day after its due date ("Late Charge") and, upon Maker/Debtor's default or after maturity, whether by acceleration or otherwise, to the extent permitted by applicable law, interest on the entire unpaid balance (excluding accrued and unpaid interest) at the maximum lawful rate permitted by law not to exceed eighteen percent (18.0%) per annum (the "Default Rate") until this Note is paid in full, plus all collection and other charges, and if placed in the hands of an attorney for collection, attorneys' fees, costs and expenses.  Unless prohibited by applicable law, during any period of time when Maker/Debtor is in default under the terms of this Note, Maker/Debtor shall pay interest on the unpaid principal amount outstanding from time to time at the maximum lawful rate, not to exceed the Default Rate, in place of the non-default interest rate payable hereunder, until the default is cured.  In no event shall any late charge or the Default Rate charged hereunder exceed any maximum permitted by law.  Interest shall be computed on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate to exceed the maximum rate allowed by applicable law, in which case such calculation shall be computed on the basis of a 365 day year.

2.    If any payment is not made when due, or if there is a default by Maker/Debtor under any present or future agreement with Holder/Secured Party or with any other entity controlled by Commercial Credit, Inc. or a default of any guarantor of Maker/Debtor's obligations under this Note or any agreement with any other entity controlled by Commercial Credit, Inc., all remaining payments shall, at the option of the Holder/Secured Party, without notice, become immediately due and payable, and the unpaid balance shall bear interest at the Default Rate until paid in full.  All installments and other sums received by Holder/Secured Party shall be applied first to interest, late charges, costs, fees and expenses, and then to principal hereunder.

3.    Maker/Debtor, any endorsers and any other persons obligated hereon each: (a) agree that the Holder/Secured Party may, without limit, grant to any one or more of them extensions of the time for payment of this Note and/or the maturity of any payment or payments, in whole or in part; (b) waive presentation for payment, demand for payment, notice of non-payment or dishonor, protest and notice of protest, notice of default and/or dishonor, and notice of the intent to accelerate and/or acceleration of the indebtedness evidenced hereby; (c) waive the benefits of any statute of limitations with respect to any action to enforce, or otherwise related to, this Note; (d) agree that the failure or delay to perfect or continue the perfection of any security interest in any property or collateral which secures the obligations of the Maker/Debtor or any endorser or other person obligated hereon, or to protect the property or collateral covered by such security interest, if any, shall not release or discharge them or any of them; (e) agree this Note is made and shall be construed under the laws of the State of Delaware; (f) agree all exemptions and homestead laws and all rights thereunder are hereby waived to the extent permitted by law; (g) agree that all amounts due hereunder are absolutely due and owing and are not subject to any claim, counterclaim, or set off of any kind, and hereby waive any claim(s) whatsoever each may have against Holder/Secured Party, whether known or unknown, as of the date of this Note; (h) agree that Holder/Secured Party may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder/Secured Party's right of recourse against Maker/Debtor, all endorsers, guarantors and other parties liable on this Note, which rights are hereby expressly reserved. Holder/Secured Party may settle with, grant forbearance to, or release any Maker/Debtor, endorser, guarantors or other parties liable on this Note without notice, and any such settlement, forbearance, or release shall not operate to release any other person or party liable hereunder; and (i) agree that Maker/Debtor's obligations hereunder shall be secured by any security agreement, mortgage, deed of trust or pledge executed by Maker/Debtor in favor of Holder/Secured Party, whether now existing or hereafter executed.

4.    In the event that any one or more of the provisions of this Note shall, for any reason, be held to be invalid, illegal or unenforceable, the same shall not affect any other provision of this Note and the remaining provisions of this Note shall remain in full force and effect. No failure by Holder/Secured Party to exercise, and no delay in exercising any right or power hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder/Secured Party of any right or power hereunder preclude any other or further exercise thereof, or the exercise of any other right or power.  No waiver or modification of any of the terms or provisions of this Note shall be valid or binding unless set forth in a writing signed by a duly authorized officer of Holder/Secured Party, and then only to the extent specifically set forth therein.

5.    As used in this Note, the term "Holder/Secured Party" includes any future Holder/Secured Party of this Note.  Holder/Secured Party and its assignees may assign this Note, in whole or in part, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise.  All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of, and shall bind the representatives, successors and assigns of the respective parties.

6.    Maker/Debtor may, subject to the terms and conditions contained herein, prepay this Note in full or in part at any time, provided Maker/Debtor shall: (i) give five days prior written notice to Holder/Secured Party specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest, late charges, and other charges accrued and/or due to Holder/Secured Party through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to

Note.B.CCG.1117F

Page | 1

the sum of .00167 of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of the voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid but not more than the maximum amount permitted by law. The principal amount of any voluntary partial prepayment shall be applied in any manner acceptable to the Holder/Secured Party in the Holder/Secured Party's sole discretion including to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

7.     The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes. If more than one party signs this Note as Maker/Debtor, the obligations of each of them shall be joint and several. Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker/Debtor and Holder/Secured Party, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no event, whether by reason of demand for payment or acceleration of maturity or otherwise, shall the interest contracted for, charged or received by Holder/Secured Party exceed the maximum amount permitted under applicable law.  The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise been earned on the date of such acceleration, and Holder/Secured Party does not intend to charge or collect any unearned interest in the event of acceleration.  If, from any circumstance whatsoever, interest would otherwise be payable to Holder/Secured Party in excess of the maximum lawful amount, the interest payable to Holder/Secured Party shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder/Secured Party shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal, to the extent permitted by applicable law, to other obligations of the Maker/Debtor owing to Holder/Secured Party, as Holder/Secured Party may determine, and thereafter any such excess shall be refunded to Maker/Debtor. All interest paid or agreed to be paid to Holder/Secured Party shall, to the extent permitted by applicable law, be amortized, prorated, and allocated throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest here on for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Maker/Debtor and Holder/Secured Party.

8.     Maker/Debtor hereby authorizes Holder/Secured Party to disclose to third-parties certain financial information relating to Maker/Debtor which Holder/Secured Party has obtained or will hereafter obtain including but not limited to payment histories, balances and due dates.

9.     Disbursement of Loan Proceeds.  The undersigned unconditionally and irrevocably authorizes and requests that Holder/Secured Party disburse the proceeds due Maker/Debtor from this Note as follows:

| | | |
|---|---|---|
| $92,000.00 | To: | GTB Trucking Inc<br>6800 Expressway 281<br>Edinburg, TX 78540 |
| $900.00 | To: | Commercial Credit Group Inc. as a fully earned non-refundable documentation fee |

Payment as outlined above will in all respects be the equivalent of payment made directly to Maker/Debtor and represents the entire amount due Maker/Debtor. Holder/Secured Party shall not be obligated to see to the application thereof by the recipient. Maker/Debtor hereby warrants and represents that all proceeds disbursed pursuant to this Note are being used for commercial business purposes only and not for any personal, family or household use.

10. To secure the prompt payment, performance and fulfillment of any and all Obligations (as hereinafter defined) of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., Maker/Debtor hereby assigns, transfers, conveys, pledges, mortgages and grants to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest and lien in each and every one of the goods, chattels and property described in the herein Description of Property and any and all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, in which Maker/Debtor now or hereafter has any right or interest, and in any and all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing (collectively called "Collateral"). Maker/Debtor grants Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest in the Collateral to secure the Obligations.

11. The term "Obligations" as used herein shall mean and include: (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. to or on account of Maker/Debtor or which Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. have or will become obligated to make, grant or extend to or for the account of Maker/Debtor; and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, attorneys fees and costs and expenses hereto and/or hereafter chargeable against Maker/Debtor by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or owing by Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., or upon which Maker/Debtor may be and/or has become liable as endorser or guarantor; and (c) all obligations and/or indebtedness of any and every kind of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. whether direct or indirect, whether contingent or absolute, whether matured or un-matured, and whether now or in the future arising, existing, incurred, contracted or owing to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or acquired by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. directly from Maker/Debtor or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (d) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing.

12.    All of the Obligations are acknowledged, affirmed and declared by Maker/Debtor to be secured by this Note. The Maker/Debtor agrees that it will fully and faithfully pay, perform and fulfill all of its Obligations.  Maker/Debtor shall pay to Holder/Secured Party on demand, on any installment of the Obligations not fully paid prior to the seventh day (or such longer period as required by law) after its due date, a late charge of 5% of any such installment ("Late Charge") and, after any default or maturity, whether by acceleration or otherwise, interest on the Obligations at the rate of eighteen percent per annum (the "Default Rate") from the date of such default or maturity (whichever is earlier), until the Obligations are collected by the Holder/Secured Party in full. In addition, Maker/Debtor agrees to pay, on demand, all attorney fees, costs and expenses, collection costs and other charges incurred by Holder/Secured Party to enforce the payment and performance of Maker/Debtor's Obligations. Any interest rate, late charge, fee or other charge ("Charge") provided for in any way hereunder or under any document, note or instrument given in connection with any of the Obligations shall not in any event or contingency exceed any maximum permitted by applicable law and any such Charge shall be deemed hereby amended to such maximum amount. Any sums collected with respect to any Charge in excess of any maximum shall be applied to reduce the principal sum owing under the Obligations and any excess refunded to Maker/Debtor.

13.    Maker/Debtor further represents and warrants to Holder/Secured Party and agrees as follows: (a) Maker/Debtor is the lawful owner of the Collateral and has paid all applicable sale, use or other taxes due in connection with the sale, purchase, ownership, possession or use of the Collateral and shall indemnify Holder/Secured Party from and against any loss, cost or expense, including penalties, interest and other charges of any kind in

connection with or arising from the sale, purchase, ownership, possession or use of the Collateral; (b) The Collateral is in the possession of Maker/Debtor at its principal place of business (which is Maker/Debtor's address shown herein), unless a different location is specifically shown on Schedule A for any one or more items; (c) The Collateral and every part thereof is and will continue to be free and clear of all liens, attachments, levies, claims, demands and encumbrances of every kind, nature and description (except any held by Holder/Secured Party); (d) Maker/Debtor will defend the Collateral against all claims and demands of all persons and will not permit any circumstances to exist under which the Holder/Secured Party may lose its lien or lien priority on the Collateral; (e) Maker/Debtor will not sell, assign, mortgage, lease, pledge or otherwise dispose of the Collateral without the prior written consent of the Holder/Secured Party, and in the event of a sale or disposition of any item(s) of the Collateral, Maker/Debtor shall hold all proceeds therefrom in trust, and immediately deliver same to Holder/Secured Party; (f) Maker/Debtor, at its own cost and expense, will maintain and keep the Collateral in good repair, will not waste, abuse or destroy the Collateral or any part thereof and will not be negligent in the care and use thereof; (g) Maker/Debtor will not remove the Collateral from within the 48 contiguous States of the United States or its present locations without the prior written consent of the Holder/Secured Party nor change its present business locations without at least thirty days prior written notice to Holder/Secured Party; (h) At all times Maker/Debtor shall allow Holder/Secured Party or its representatives free access to and right of inspection of the Collateral, which shall remain personally and not become a part of any realty. Nothing shall prevent Holder/Secured Party from removing all or any part of the Collateral as Holder/Secured Party, in its sole discretion may determine, from any premises to which it may be attached and/or upon which it may be located. Maker/Debtor agrees to deliver to Holder/Secured Party all appropriate waivers which any such premises on which the Collateral may be located from time to time; (i) Maker/Debtor shall insure that (so far as may be necessary to protect the Collateral and the lien of this Note thereon) all of the terms and conditions of any leases covering the premises wherein the Collateral may be located are consistent with and will not result in a violation hereof, and Maker/Debtor shall comply with any orders, ordinances, laws or statutes of any city, state, or other entity having jurisdiction over the premises or the conduct of business thereon, and, where requested by Holder/Secured Party, will correct any defects or execute any written instruments and do any other acts necessary to more fully execute the purposes and provisions of this Security Agreement; (j) Maker/Debtor has the sole right and lawful authority to enter into this Note and, if a corporation or limited liability company, the execution of this Note has been duly consented to and authorized by all of the stockholders or members of the Maker/Debtor and duly authorized by its Board of Directors or Managers as applicable. Maker/Debtor agrees to deliver to Holder/Secured Party evidence thereof satisfactory to Holder/Secured Party immediately upon request; (k) Each person signing this Note has full authority to sign for the Maker/Debtor; (l) Maker/Debtor will indemnify and save Holder/Secured Party harmless from all losses, costs, damages, liabilities or expenses, including reasonable attorneys' fees, costs and expenses, that Holder/Secured Party may sustain or incur in connection with this Note or the Obligations, including any effort to obtain or enforce payment, performance or fulfillment of any of the Obligations or in the enforcement of, or foreclosure of Collateral under the terms of this Note or in the prosecution or defense of any action or proceeding either against Maker/Debtor or against Holder/Secured Party concerning any matter growing out of or connected with this Note and/or any of the Obligations and/or any of the Collateral. The aforementioned indemnity or any other indemnity obligation under this Note shall survive termination hereof; (m) At Holder/Secured Party's request Maker/Debtor will furnish current financial statements satisfactory to Holder/Secured Party in form, preparation and content; (n) no Blocked Person has or shall acquire an ownership interest in or control of Maker/Debtor. "Blocked Person" means any person or entity that is now or at any time (i) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (ii) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (iii) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Holder, to be a person with whom Holder is not permitted to extend credit to or with regard to whom, a lending relationship may result in penalties against Holder or limitations on a holder's ability to enforce a transaction.

14.    To secure all the Obligations Maker/Debtor authorizes Holder/Secured Party to file one or more financing statements and/or a reproduction hereof as a financing statement, and any other lien-related forms or documents relating to the Collateral, from time to time as Holder/Secured Party deems in its sole discretion appropriate, in any jurisdiction (and Maker/Debtor shall execute any financing statement or amendment thereto) and Maker/Debtor hereby irrevocably appoints Holder/Secured Party as the true and lawful Attorney-in-Fact of Maker/Debtor, coupled with an interest, with full power in Maker/Debtor's name, place and stead to execute financing statements on Maker/Debtor's behalf and to do any and all other acts on Maker/Debtor's behalf necessary or helpful to perfect and continue perfection of Holder/Secured Party's security interest in the Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the Collateral on the attached Description of Property and/or on any documents related hereto. Maker/Debtor hereby consents to the use and installation on the Collateral (at Holder/Secured Party's option and expense) of global positioning or similar hardware that monitors the location of the Collateral. Maker/Debtor may not remove or disable such hardware without the written consent of the Holder/Secured Party. If installed, Maker/Debtor shall be responsible for damage to or removal of such hardware without Holder/Secured Party's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by the Holder/Secured Party, and may be disabled or removed from the Collateral by Holder/Secured Party without notice of any kind. The hardware and services it facilitates are for the sole use of the Holder/Secured Party and Maker/Debtor releases and holds Holder/Secured Party harmless from the use of any such hardware or the information obtained.

15.    Maker/Debtor will insure the Collateral, at its sole cost and expenses, by maintaining an "all risks" insurance policy naming the Holder/Secured Party as additional insured and loss payee, in an amount at least equal to the full replacement value of all Collateral identified in the Description of Property and also, where requested by Holder/Secured Party, against other hazards (including but not limited to comprehensive general liability insurance), with companies, in amounts of coverage and deductible provisions, and under policies acceptable to Holder/Secured Party. Each policy shall be delivered to Holder/Secured Party and shall expressly state that insurance as to Holder/Secured Party shall not be invalidated by any act, omission or neglect of Maker/Debtor and that the insurer shall give thirty (30) days written notice to Holder/Secured Party of any alteration, termination or cancellation of the policy. Holder/Secured Party shall have the right, but not the obligation, to provide insurance for its interest and charge Maker/Debtor Holder/Secured Party's cost for such insurance, together with it or its designee's customary charges or fees associated with its insurance. Maker/Debtor hereby irrevocably appoints Holder/Secured Party as Maker/Debtor's Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto.

16.    If Maker/Debtor shall be in default in the full, prompt and faithful performance of any of the terms, conditions and provisions of this Note, Holder/Secured Party may, at its option, (but shall not be obligated to), without waiving its right to enforce this Security Agreement according to its terms, immediately or at any time thereafter, and without notice to or demand upon Maker/Debtor, perform or cause the performance of such terms, conditions or provisions, for the account and at the sole cost and expense of Maker/Debtor, which (including reasonable attorneys' fees, costs and expenses) shall be secured by the Collateral, added to the amount of the Obligations, without notice to Maker/Debtor, and shall be payable on demand with interest at the Default Rate specified in Paragraph 1 hereof.

17.    Maker/Debtor shall be in default upon the occurrence of any of the following: (a) Maker/Debtor defaults in the prompt payment, performance or fulfillment of any of Maker/Debtor's Obligations; (b) Maker/Debtor shall fail to punctually and faithfully fulfill, observe or perform any of the terms, conditions, provisions, representations and warranties contained in this Note, the Obligations, or in any present or future agreement or instrument made by Maker/Debtor and then held by Holder/Secured Party; (c) Maker/Debtor or any guarantor of any of Maker/Debtor's Obligations under this Note ("Guarantor") dies or is materially disabled, ceases to do business, becomes insolvent, declares or is determined to be a Maker/Debtor under the bankruptcy code, or makes an assignment for the benefit of creditors; (d) any of the warranties, covenants or representations made by Maker/Debtor or any Guarantor to Holder/Secured Party be or become untrue or incorrect in any respect; (e) a change in the management, operations, ownership of stock or membership units or control of Maker/Debtor; (f) Holder/Secured Party at any time deems the security afforded by this Note unsafe, inadequate or at any risk or any of the Collateral in danger of misuse, concealment or misappropriation. (g) any attachment, levy or

execution against Maker/Debtor or any Guarantor that is not released within 60 hours; (h) Maker/Debtor's or any Guarantor's affairs so evolve such that, in Holder/Secured Party's sole discretion, Holder/Secured Party thereby becomes insecure as to the performance of this Note or any other agreement with Maker/Debtor; (i) Maker/Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation, other encumbrance (other than Holder/Secured Party's interest), or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral or any of Holder/Secured Party's interests under this Note or any of the Obligations; (j) Maker/Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (k) failure of Maker/Debtor to obtain or maintain insurance on the Collateral satisfactory to Holder/Secured Party in its sole discretion; or (l) any of the Obligations, this Note, the security interest granted herein or any provision hereof for any reason attributable to Maker/Debtor, ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Maker/Debtor or Maker/Debtor shall deny that it has any further liability or obligation thereunder.

18.  Upon any default by Maker/Debtor, the rate of interest shall automatically increase to the Default Rate, and Maker/Debtor shall immediately deliver possession of the Collateral to Holder/Secured Party, and Holder/Secured Party, without demand or notice, may exercise any of the following remedies: (a) Accelerate the maturity of and declare the entire indebtedness under all or part of Obligations immediately due and payable; (b) Take possession of all or part the Collateral, at any time, wherever it may be, and to enter any premises, with or without process of law, and search for, take possession of, remove, or keep and store the Collateral on said premises until sold, without liability for trespass nor charge for storage; (c) Sell the Collateral or any part thereof and all of the Maker/Debtor's equity of redemption therein at public or private sale, for cash or on credit, and on such terms as Holder/Secured Party may in its sole discretion elect, in such county and at such places as Holder/Secured Party may elect and without having the Collateral at the place of sale. In the event Holder/Secured Party sells all or part of the Collateral at public or private sale, then (i) Holder/Secured Party shall not be required to refurbish, repair or otherwise incur any expenses in preparing Collateral for sale but may sell its interest therein on an "AS-IS," "WHERE-IS" basis; (ii) Holder/Secured Party may bid or become the purchaser at any such sale and Maker/Debtor waives any and all rights of redemption from any such sale; (iii) Any public sale will be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before such sale and advertised in at least one newspaper of general circulation in the area of the sale at least twice prior to the date of sale and if upon terms of 25% cash down with the balance payable in good funds within 24 hours or other more favorable terms in the discretion of Holder/Secured Party; (iv) The proceeds of any public or private sale shall first be applied to the costs and expenses of Holder/Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions, and second to the payment, partly or entirely, of any of the Obligations as Holder/Secured Party may in its sole discretion elect, returning the excess, if any, to Maker/Debtor or such other party in interest as the required by law; Maker/Debtor shall remain liable to Holder/Secured Party for any deficiency plus interest thereon as provided above; (v) Any private sale shall be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before the sale date stated therein at the address indicated above, and credit given for the full price stated, less attorneys' fees costs and expenses. No action taken by Holder/Secured Party shall release Maker/Debtor from any of its Obligations to Holder/Secured Party. Maker/Debtor acknowledges and agrees that in any action or proceeding brought by Holder/Secured Party to obtain possession of any Collateral, Holder/Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Maker/Debtor and if Maker/Debtor contests Holder/Secured Party's right to possession of any Collateral in any action or proceeding, Maker/Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Maker/Debtor's unpaid Obligations to Holder/Secured Party, whichever is less. Holder/Secured Party may without prior notice to or demand upon Maker/Debtor and with or without the exercise of any of Holder/Secured Party's other rights or remedies, apply toward the payment of Maker/Debtor's Obligations (at any time owing to Holder/Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Maker/Debtor and coming into Holder/Secured Party's possession and for such purpose may endorse Maker/Debtor's name on any instrument or document payable to Maker/Debtor (whether for deposit, collection, discount or negotiation). Without notice to Maker/Debtor, Holder/Secured Party may apply such sums or change applications of sums previously paid and/or to be paid to Holder/Secured Party, to such Obligations as Holder/Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

19.  Maker/Debtor, at Holder/Secured Party's option, hereby irrevocably consents to the appointment of a receiver or keeper for the Collateral and/or all other property of Maker/Debtor, and of the rents, issued as proceeds thereof. Maker/Debtor expressly waives any right to notice or hearing in any action to recover possession of any or all of the Collateral. Any notices hereunder shall be in writing and effective when delivered in person to an officer of the party to whom addressed or mailed by certified mail to such party at its address specified herein or at such other address as may hereafter be specified by like notice by either party to the other. Reasonable notification hereunder shall be any notification given or sent at least five (5) days prior to the event for which such notification is sent. Maker/Debtor agrees that upon the request of Holder/Secured Party, after any default, to segregate and hold all or any part of the Collateral in a fiduciary capacity and to adequately maintain, service and insure said property and to protect same from use and/or abuse, all without charge to Holder/Secured Party, such fiduciary duty to terminate only upon the actual delivery of the Collateral to Holder/Secured Party. Maker/Debtor, recognizing that in the event of default no remedy at law would provide adequate relief to Holder/Secured Party, agrees that Holder/Secured Party shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

**20.  MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREOF AGREE TO THE EXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN MECKLENBURG COUNTY, NORTH CAROLINA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSSCLAIMS ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS SECURITY AGREEMENT, WITH THE SOLE EXCEPTIONS THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF THE COLLATERAL OR ANY OTHER ASSETS OF THE MAKER/DEBTOR OR ANY GUARANTOR HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF THE HOLDER/SECURED PARTY, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE THE MAKER/DEBTOR, OR ANY GUARANTOR, OR THE COLLATERAL AND/OR ANY OTHER ASSETS OF THE MAKER/DEBTOR, OR GUARANTOR MAY BE LOCATED. MAKER/DEBTOR AND HOLDER/SECURED PARTY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT IN ACCORDANCE HEREWITH.  MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSSCLAIMS AND SETOFF OR RECOUPMENT CLAIMS ARISING EITHER DIRECTLY OR INDIRECTLY BETWEEN OR AMONG THEM AND/OR INVOLVING ANY PERSON OR ENTITY CLAIMING ANY RIGHTS ACQUIRED BY, THROUGH OR UNDER ANY PARTY AND FURTHER WAIVE ANY AND ALL RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES.**

21.  Holder/Secured Party may at any time, with or without exercising any of the rights or remedies aforesaid and without prior notice or demand to Maker/Debtor, appropriate and apply toward the payment of the Obligations any and all balances, sums, property, credits, deposits, accounts, reserves, collections, drafts, notes or checks coming into Holder/Secured Party's possession and belonging or owing to Maker/Debtor, and for such purposes, endorse the name of Maker/Debtor on any such instrument made payable to Maker/Debtor for deposit, negotiation, discount or collection. Such applications may be made, or any monies paid to Holder/Secured Party may be applied, without notice to Maker/Debtor, partly or entirely to such of the Obligations as Holder/Secured Party in its sole discretion may elect. In its sole discretion Holder/Secured Party may apply

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC

and/or change applications of any sums paid and/or to be paid by or for Maker/Debtor, under any circumstances, to any obligations of Maker/Debtor to Holder/Secured Party, presently existing or otherwise. The interest rates which may be provided for in any instrument evidencing one or more Obligations shall in no event, circumstance or contingency exceed any maximum permitted by applicable law.

22. No failure to exercise, no delay in exercising, and no single or partial exercise on the part of Holder/Secured Party of any right, privilege, remedy, or power under the Note, shall operate as a waiver thereof or preclude Holder/Secured Party from exercising any other right, privilege, remedy or power under this Note whether or not Maker/Debtor is in default hereunder. No waiver of any provision of the Note shall be effective unless in writing, signed by a duly authorized officer of the party to be charged, and no amendment, supplement or other modification of the Note shall be effective unless in writing signed by each of the parties hereto. This instrument constitutes the entire agreement between the parties. This Note cannot be modified or terminated orally. Only a written instrument, signed by an officer of the Holder/Secured Party, shall be effective to modify or terminate any obligation of Maker/Debtor to Holder/Secured Party, this Note or any other agreement between the parties but only to the extent therein specifically set forth therein. All other entities controlled by Commercial Credit, Inc. shall include Transfac Capital, Inc.

23. This Note may be assigned along with any and all Obligations, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise, and such assignee shall be entitled to at least the same rights as Holder/Secured Party. All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee, transferee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms, conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of and shall bind the representatives, successors and assigns of the respective parties.

24. Some of the Collateral may be in the hands of Maker/Debtor under one or more security agreements, installment sale contracts, lease agreements, notes or other instruments which are or may be held by Holder/Secured Party and with respect to such Collateral. Holder/Secured Party by accepting this Note shall not in any manner be considered as having waived any security interest arising independently of this Note nor shall this Note be construed as adversely affecting any rights of Holder/Secured Party under any other security agreement nor as a waiver of any of the terms and provisions of any other security agreement, guaranty or endorsement in favor of Holder/Secured Party, all of which shall remain and continue in full force and effect and shall be cumulative.

25. Intending that each and every provision of this Note be fully effective and enforceable according to its terms, the parties agree that the validity, enforceability and effectiveness of each provision hereof and the obligations, rights and remedies of the Maker/Debtor and Holder/Secured Party in any way related to or arising under this Note or under one or more Obligation shall be governed by and construed in accordance with the laws of the State of Delaware (excluding its choice of law rules). If any one or more provisions hereof are in conflict with any statute or law and thus not valid or enforceable, then each such provision shall be deemed null and void but only to the extent of such conflict and without invalidating or affecting the remaining provisions hereof. This contract shall be binding upon the heirs, administrators, legal representatives and successors of the Maker/Debtor.

26. **DESCRIPTION OF PROPERTY**

| Quantity | Year | Manufacturer | Model | Specifications | Serial Number |
|---|---|---|---|---|---|
| 1 | 2010 | Utility | | 53' Refrigerated trailer with a Carrier refrigeration unit (S/N: MAB91098566) | 1UYVS2538AU862201 |
| 1 | 2013 | Utility | | 53' Refrigerated trailer with a Carrier refrigeration unit (S/N: 6001111941) | 1UYVS2532DU502703 |
| 1 | 2013 | Utility | | 53' Refrigerated trailer with a Carrier refrigeration unit (S/N: 6001111936) | 1UYVS2530DU502702 |

Each including all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including any rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing.

27. **THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.**

The undersigned, if more than one, shall be jointly and severally liable hereunder and all provisions hereof shall apply to each of them.

IN WITNESS WHEREOF, Maker/Debtor has caused these presents to be duly executed, the day and year first above written.
MAKER/DEBTOR/:
**Zaid Carriers LLC**
(Debtor)                    (Seal)

By: _____    Manager
                                    (Title)

_____
(Witness to Debtor's Signature)
Address: 1405 Encantado Circle Mission TX, 78572

## AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date: January 03, 2020

WHEREAS, Zaid Carriers LLC      as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated January 24, 2018 and payable to the order of **Commercial Credit Group Inc.**, its successors and assigns ("CCG"), with installment payments originally totaling $108,528.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Paper is $48,690.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on March 15, 2020 and on the 15th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Paper, as follows:

        15   Installment(s) each in the amount of  $2,848.00            Followed By
        1    Installment(s) each in the amount of  $5,970.00

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Extension had never been entered into. As further consideration for CCG's agreement to the terms of this Extension, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind,, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Paper and/or this Extension, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations. Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Paper is and

will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Paper or otherwise. Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained. Any promissory note made and delivered by Obligor to CCG in connection with this Extension shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Extension shall not diminish or prejudice CCG's rights or alter CCG's position under the Paper. Except as expressly modified by this Extension, all terms, conditions and provisions of the Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Paper, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.


IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above


**Commercial Credit Group Inc.**

By: _____
                                    Title

**Zaid Carriers LLC**
**(Obligor)**

By: _____  Manager
                                    Title

EZ.EXT.B. 0618.F

This is a copy view of the Authoritative Copy h
by the designated custodian

## AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date: July 02, 2020

WHEREAS, Zaid Carriers LLC  as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated January 09, 2020 and payable to the order of **Commercial Credit Group Inc.**, its successors and assigns ("CCG"), with installment payments originally totaling $22,932.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Paper is $23,044.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on August 10, 2020 and on the 10th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Paper, as follows:

    25   Installment(s) each in the amount of  $819.00       Followed By
    1    Installment(s) each in the amount of  $2,569.00

    $0.00

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Extension had never been entered into.  As further consideration for CCG's agreement to the terms of this Extension, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind,, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Paper and/or this Extension,

together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations. Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Paper is and will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Paper or otherwise. Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained. Any promissory note made and delivered by Obligor to CCG in connection with this Extension shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Extension shall not diminish or prejudice CCG's rights or alter CCG's position under the Paper. Except as expressly modified by this Extension, all terms, conditions and provisions of the Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Paper, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.

IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above

**Commercial Credit Group Inc.**

By: Brad Cummins          AVP - Operations
    Brad Cummins              Title
    D7C00F5803AE40T...

**Zaid Carriers LLC**
**(Obligor)**

By: Maribel Diaz
    Maribel Diaz, Manager
    67E8C20C01F9EA...

# EXHIBIT A-3

 **NEGOTIABLE PROMISSORY NOTE and SECURITY AGREEMENT (the "Note")**

Commercial Credit Group

**$104,860.00**                                                                                            **July 23, 2018**
Total Amount of Scheduled Note Payments                                                          Date

**Zaid Carriers LLC**
**("MAKER/DEBTOR")**

For value received, the undersigned (hereinafter referred to as "Maker/Debtor"), jointly and severally if more than one, irrevocably and unconditionally promises to pay to the order of <u>Commercial Credit Group Inc.</u>, its successor or assigns (hereinafter referred to "Holder/Secured Party") at <u>2135 City Gate Lane, Suite 440, Naperville, IL 60563</u> or such other place as the Holder/Secured Party hereof may from time to time appoint, the sum of <u>One Hundred Four Thousand Eight Hundred Sixty And 00/100</u> Dollars <u>($104,860.00)</u> in consecutive monthly installments as follows:

    1    Installment(s) each in the amount of  $7,490.00  Followed By
   26    Installment(s) each in the amount of  $3,745.00

    1.    The first Installment shall be due on 07/23/2018 . The second Installment shall be due on 09/05/2018 and each of the remaining consecutive monthly Installments shall be due on the same date of each month thereafter until the indebtedness under this Note is paid in full. The Total Amount of Scheduled Note Payments includes pre-computed interest (at the "non default interest rate"). Maker/Debtor on demand shall pay a late charge of 5% of any installment that has not been fully paid prior to the seventh day after its due date ("Late Charge") and, upon Maker/Debtor's default or after maturity, whether by acceleration or otherwise, to the extent permitted by applicable law, interest on the entire unpaid balance (excluding accrued and unpaid interest) at the maximum lawful rate permitted by law not to exceed eighteen percent (18.0%) per annum (the "Default Rate") until this Note is paid in full, plus all collection and other charges, and if placed in the hands of an attorney for collection, attorneys' fees, costs and expenses. Unless prohibited by applicable law, during any period of time when Maker/Debtor is in default under the terms of this Note, Maker/Debtor shall pay interest on the unpaid principal amount outstanding from time to time at the maximum lawful daily rate, not to exceed the Default Rate, in place of the non-default interest rate payable hereunder, until the default is cured. In no event shall any late charge or the Default Rate charged hereunder exceed any maximum permitted by law. Interest shall be computed on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate to exceed the maximum rate allowed by applicable law, in which case such calculation shall be computed on the basis of a 365 day year.

    2.    If any payment is not made when due, or if there is a default by Maker/Debtor under any present or future agreement with Holder/Secured Party or with any other entity controlled by Commercial Credit, Inc. or a default of any guarantor of Maker/Debtor's obligations under this Note or any agreement with any other entity controlled by Commercial Credit, Inc., all remaining payments shall, at the option of the Holder/Secured Party, without notice, become immediately due and payable, and the unpaid balance shall bear interest at the Default Rate until paid in full. All installments and other sums received by Holder/Secured Party shall be applied first to interest, late charges, costs, fees and expenses, and then to principal hereunder.

    3.    Maker/Debtor, any endorsers and any other persons obligated hereon each: (a) agree that the Holder/Secured Party may, without limit, grant to any one or more of them extensions of the time for payment of this Note and/or the maturity of any payment or payments, in whole or in part; (b) waive presentation for payment, demand for payment, notice of non-payment or dishonor, protest and notice of protest, notice of default and/or dishonor, and notice of the intent to accelerate and/or acceleration of the indebtedness evidenced hereby; (c) waive the benefits of any statute of limitations with respect to any action to enforce, or otherwise related to, this Note; (d) agree that the failure or delay to perfect or continue the perfection of any security interest in any property or collateral which secures the obligations of the Maker/Debtor or any endorser or other person obligated hereon, or to protect the property or collateral covered by such security interest, if any, shall not release or discharge them or any of them; (e) agree this Note is made and shall be construed under the laws of the State of Delaware; (f) agree all exemptions and homestead laws and all rights thereunder are hereby waived to the extent permitted by law; (g) agree that all amounts due hereunder are absolutely due and owing and are not subject to any claim, counterclaim, or set off of any kind, and hereby waive any claim(s) whatsoever each may have against Holder/Secured Party, whether known or unknown, as of the date of this Note; (h) agree that Holder/Secured Party may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder/Secured Party's right of recourse against Maker/Debtor, all endorsers, guarantors and other parties liable on this Note, which rights are hereby expressly reserved. Holder/Secured Party may settle with, grant forbearance to, or release any Maker/Debtor, endorser, guarantors or other parties liable on this Note without notice, and any such settlement, forbearance, or release shall not operate to release any other person or party liable hereunder; and (i) agree that Maker/Debtor's obligations hereunder shall be secured by any security agreement, mortgage, deed of trust or pledge executed by Maker/Debtor in favor of Holder/Secured Party, whether now existing or hereafter executed.

    4.    In the event that any one or more of the provisions of this Note shall, for any reason, be held to be invalid, illegal or unenforceable, the same shall not affect any other provision of this Note and the remaining provisions of this Note shall remain in full force and effect. No failure by Holder/Secured Party to exercise, and no delay in exercising any right or power hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder/Secured Party of any right or power hereunder preclude any other or further exercise thereof, or the exercise of any other right or power. No waiver or modification of any of the terms or provisions of this Note shall be valid or binding unless set forth in a writing signed by a duly authorized officer of Holder/Secured Party, and then only to the extent specifically set forth therein.

    5.    As used in this Note, the term "Holder/Secured Party" includes any future Holder/Secured Party of this Note. Holder/Secured Party and its assignees may assign this Note, in whole or in part, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise. All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of, and shall bind the representatives, successors and assigns of the respective parties.

    6.    Maker/Debtor may, subject to the terms and conditions contained herein, prepay this Note in full or in part at any time, provided Maker/Debtor shall: (i) give five days prior written notice to Holder/Secured Party specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest, late charges, and other charges accrued and/or due to Holder/Secured Party through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

the sum of .00167 of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of the voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid but not more than the maximum amount permitted by law. The principal amount of any voluntary partial prepayment shall be applied in any manner acceptable to the Holder/Secured Party in the Holder/Secured Party's sole discretion including to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

7.    The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes. If more than one party signs this Note as Maker/Debtor, the obligations of each of them shall be joint and several. Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker/Debtor and Holder/Secured Party, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no event, whether by reason of demand for payment or acceleration of maturity or otherwise, shall the interest contracted for, charged or received by Holder/Secured Party exceed the maximum amount permitted under applicable law. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise been earned on the date of such acceleration, and Holder/Secured Party does not intend to charge or collect any unearned interest in the event of acceleration. If, from any circumstance whatsoever, interest would otherwise be payable to Holder/Secured Party in excess of the maximum lawful amount, the interest payable to Holder/Secured Party shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder/Secured Party shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal, to the extent permitted by applicable law, to other obligations of the Maker/Debtor owing to Holder/Secured Party, as Holder/Secured Party may determine, and thereafter any such excess shall be refunded to Maker/Debtor. All interest paid or agreed to be paid to Holder/Secured Party shall, to the extent permitted by applicable law, be amortized, prorated, and allocated throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest here on for such full period shall not exceed the maximum amount permitted by applicable law. This paragraph shall control all agreements between Maker/Debtor and Holder/Secured Party.

8.    Maker/Debtor hereby authorizes Holder/Secured Party to disclose to third-parties certain financial information relating to Maker/Debtor which Holder/Secured Party has obtained or will hereafter obtain including but not limited to payment histories, balances and due dates.

9.    Disbursement of Loan Proceeds. The undersigned unconditionally and irrevocably authorizes and requests that Holder/Secured Party disburse the proceeds due Maker/Debtor from this Note as follows:

| $900.00 | To: | Commercial Credit Group Inc. as a fully earned non-refundable documentation fee |
|---|---|---|
| $69,123.00 | To: | Border Truck Sales<br>5601 S 23rd St<br>McAllen, TX 78503 |
| $23,500.00 | To: | JD Lion Carrier LLC<br>601 E Seminole Ave<br>Pharr, TX 78577 |

Payment as outlined above will in all respects be the equivalent of payment made directly to Maker/Debtor and represents the entire amount due Maker/Debtor. Holder/Secured Party shall not be obligated to see to the application thereof by the recipient. Maker/Debtor hereby warrants and represents that all proceeds disbursed pursuant to this Note are being used for commercial business purposes only and not for any personal, family or household use.

10.    To secure the prompt payment, performance and fulfillment of any and all Obligations (as hereinafter defined) of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., Maker/Debtor hereby assigns, transfers, conveys, pledges, mortgages and grants to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest and lien in each and every one of the goods, chattels and property described in the herein Description of Property and any and all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, in which Maker/Debtor now or hereafter has any right or interest, and in any and all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing (collectively called "Collateral"). Maker/Debtor grants Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest in the Collateral to secure the Obligations.

11.    The term "Obligations" as used herein shall mean and include: (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. to or on account of Maker/Debtor or which Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. have or will become obligated to make, grant or extend to or for the account of Maker/Debtor; and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, attorneys fees and costs and expenses hereto and/or hereafter chargeable against Maker/Debtor by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or owing by Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., or upon which Maker/Debtor may be and/or has become liable as endorser or guarantor; and (c) all obligations and/or indebtedness of any and every kind of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. whether direct or indirect, whether contingent or absolute, whether matured or un-matured, and whether now or in the future arising, existing, incurred, contracted or owing to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or acquired by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. directly from Maker/Debtor or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (d) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing.

12.    All of the Obligations are acknowledged, affirmed and declared by Maker/Debtor to be secured by this Note. The Maker/Debtor agrees that it will fully and faithfully pay, perform and fulfill all of its Obligations. Maker/Debtor shall pay to Holder/Secured Party on demand, on any installment of the Obligations not fully paid prior to the seventh day (or such longer period as required by law) after its due date, a late charge of 5% of any such installment ("Late Charge") and, after any default or maturity, whether by acceleration or otherwise, interest on the Obligations at the rate of eighteen percent per annum (the "Default Rate") from the date of such default or maturity (whichever is earlier), until the Obligations are collected by the Holder/Secured Party in full. In addition, Maker/Debtor agrees to pay, on demand, all attorney fees, costs and expenses, collection costs and other charges incurred by Holder/Secured Party to enforce the payment and performance of Maker/Debtor's Obligations. Any interest rate, late charge, fee or other charge ("Charge") provided for in any way hereunder or under any document, note or instrument given in connection with any of the Obligations shall not in any event or under any contingency exceed any maximum permitted by applicable law and any such Charge shall be deemed hereby amended to such maximum amount. Any sums collected with respect to any Charge in excess of any maximum shall be applied to reduce the principal sum owing under the Obligations and any excess refunded to Maker/Debtor.

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

13.  Maker/Debtor further represents and warrants to Holder/Secured Party and agrees as follows: (a) Maker/Debtor is the lawful owner of the Collateral and has paid all applicable sale, use or other taxes due in connection with the sale, purchase, ownership, possession or use of the Collateral and shall indemnify Holder/Secured Party from and against any loss, cost or expense, including penalties, interest and other charges of any kind in connection with or arising from the sale, purchase, ownership, possession or use of the Collateral; (b) The Collateral is in the possession of Maker/Debtor at its principal place of business (which is Maker/Debtor's address shown herein), unless a different location is specifically shown on Schedule A for any one or more items; (c) The Collateral and every part thereof is and will continue to be free and clear of all liens, attachments, levies, claims, demands and encumbrances of every kind, nature and description (except any held by Holder/Secured Party); (d) Maker/Debtor will defend the Collateral against all claims and demands of all persons and will not permit any circumstances to exist under which the Holder/Secured Party may lose its lien or lien priority on the Collateral; (e) Maker/Debtor will not sell, assign, mortgage, lease, pledge or otherwise dispose of the Collateral without the prior written consent of the Holder/Secured Party, and in the event of a sale or disposition of any item(s) of the Collateral, Maker/Debtor shall hold all proceeds therefrom in trust, and immediately deliver same to Holder/Secured Party; (f) Maker/Debtor, at its own cost and expense, will maintain and keep the Collateral in good repair, will not waste, abuse or destroy the Collateral or any part thereof and will not be negligent in the care and use thereof; (g) Maker/Debtor will not remove the Collateral from within the 48 contiguous States of the United States or its present locations without the prior written consent of the Holder/Secured Party nor change its present business locations without at least thirty days prior written notice to Holder/Secured Party; (h) At all times Maker/Debtor shall  allow Holder/Secured Party or its representatives free access to and right of inspection of the Collateral, which shall remain personally and not become a part of any realty. Nothing shall prevent Holder/Secured Party from removing all or any part of the Collateral as Holder/Secured Party, in its sole discretion may determine, from any premises to which it may be attached and/or upon which it may be located. Maker/Debtor agrees to deliver to Holder/Secured Party all  appropriate waivers which Holder/Secured Party may request in its absolute discretion, in a form satisfactory to Holder/Secured Party, of owners, landlords and mortgagees of any such premises on which the Collateral may be located from time to time; (i) Maker/Debtor shall insure that (so far as may be necessary to protect the Collateral and the lien of this Note thereon) all of the terms and conditions of any leases covering the premises wherein the Collateral may be located are consistent with and will not result in a violation hereof, and Maker/Debtor shall comply with any orders, ordinances, laws or statutes of any city, state, or other entity having jurisdiction over the premises or the conduct of business thereon, and, where requested by Holder/Secured Party, will correct any defects or execute any written instruments and do any other acts necessary to more fully execute the purposes and provisions of this Security Agreement; (j) Maker/Debtor has the sole right and lawful authority to enter into this Note and, if a corporation or limited liability company, the execution of this Note has been duly consented to and authorized by all of the stockholders or members of the Maker/Debtor and duly authorized by its Board of Directors or Managers as applicable.  Maker/Debtor agrees to deliver to Holder/Secured Party evidence thereof satisfactory to Holder/Secured Party immediately upon request; (k) Each person signing this Note has full authority to sign for the Maker/Debtor; (l) Maker/Debtor will indemnify and save Holder/Secured Party harmless from all losses, costs, damages, liabilities or expenses, including reasonable attorneys' fees, costs and expenses, that Holder/Secured Party may sustain or incur in connection with this Note or the Obligations, including any effort to obtain or enforce payment, performance or fulfillment of any of the Obligations or in the enforcement of, or foreclosure of Collateral under the terms of this Note or in the prosecution or defense of any action or proceeding either against Maker/Debtor or against Holder/Secured Party concerning any matter growing out of or connected with this Note and/or any of the Obligations and/or any of the Collateral. The aforementioned indemnity or any other indemnity obligation under this Note shall survive termination hereof; (m) At Holder/Secured Party's request Maker/Debtor will furnish current financial statements satisfactory to Holder/Secured Party in form, preparation and content; (n) no Blocked Person has or shall acquire an ownership interest in or control of Maker/Debtor. "Blocked Person" means any person or entity that is now or at any time (i) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (ii) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (iii) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Holder, to be a person with whom Holder is not permitted to extend credit to or with regard to whom, a lending relationship may result in penalties against Holder or limitations on a holder's ability to enforce a transaction.

14.  To secure all the Obligations Maker/Debtor authorizes Holder/Secured Party to file one or more financing statements and/or a reproduction hereof as a financing statement, and any other lien-related forms or documents relating to the Collateral, from time to time as Holder/Secured Party deems in its sole discretion appropriate, in any jurisdiction  (and Maker/Debtor shall execute any financing statement or amendment thereto) and Maker/Debtor hereby irrevocably appoints Holder/Secured Party as the true and lawful Attorney-in-Fact of Maker/Debtor, coupled with an interest, with full power in Maker/Debtor's name, place and stead to execute financing statements on Maker/Debtor's behalf and to do any and all other acts on Maker/Debtor's behalf necessary or helpful to perfect and continue perfection of Holder/Secured Party's security interest in the Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the Collateral on the attached Description of Property and/or on any documents related hereto. Maker/Debtor hereby consents to the use and installation on the Collateral (at Holder/Secured Party's option and expense) of global positioning or similar hardware that monitors the location of the Collateral. Maker/Debtor may not remove or disable such hardware without the written consent of the Holder/Secured Party. If installed, Maker/Debtor shall be responsible for damage to or removal of such hardware without Holder/Secured Party's prior written consent.  All such hardware and information obtained therefrom shall be owned exclusively by the Holder/Secured Party, and may be disabled or removed from the Collateral by Holder/Secured Party without notice of any kind. The hardware and services it facilitates are for the sole use of the Holder/Secured Party and Maker/Debtor releases and holds Holder/Secured Party harmless from the use of any such hardware or the information obtained.

15.  Maker/Debtor will insure the Collateral, at its sole cost and expenses, by maintaining an "all risks" insurance policy naming the Holder/Secured Party as additional insured and loss payee, in an amount at least equal to the full replacement value of all Collateral identified in the Description of Property and also, where requested by Holder/Secured Party, against other hazards (including but not limited to comprehensive general liability insurance), with companies, in amounts of coverage and deductible provisions, and under policies acceptable to Holder/Secured Party. Each policy shall be delivered to Holder/Secured Party and shall expressly state that insurance as to Holder/Secured Party shall not be invalidated by any act, omission or neglect of Maker/Debtor and that the insurer shall give thirty (30) days written notice to Holder/Secured Party of any alteration, termination or cancellation of the policy.  Holder/Secured Party shall have the right, but not the obligation, to provide insurance for its interest and charge Maker/Debtor Holder/Secured Party's cost for such insurance, together with it or its designee's customary charges or fees associated with its insurance. Maker/Debtor hereby irrevocably appoints Holder/Secured Party as Maker/Debtor's Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto.

16.  If Maker/Debtor shall be in default in the full, prompt and faithful performance of any of the terms, conditions and provisions of this Note, Holder/Secured Party may, at its option, (but shall not be obligated to), without waiving its right to enforce this Security Agreement according to its terms, immediately or at any time thereafter, and without notice to or demand upon Maker/Debtor, perform or cause the performance of such terms, conditions or provisions, for the account and at the sole cost and expense of Maker/Debtor, which (including reasonable attorneys' fees, costs and expenses) shall be secured by the Collateral, added to the amount of the Obligations, without notice to Maker/Debtor, and shall be payable on demand with interest at the Default Rate specified in Paragraph 1 hereof.

17.  Maker/Debtor shall be in default upon the occurrence of any of the following: (a) Maker/Debtor defaults in the prompt payment, performance or fulfillment of any of Maker/Debtor's Obligations; (b) Maker/Debtor shall fail to punctually and faithfully fulfill, observe or perform any of the terms, conditions, provisions, representations and warranties contained in this Note, the Obligations, or in any present or future agreement or instrument made by Maker/Debtor and then held by Holder/Secured Party; (c) Maker/Debtor or any guarantor of any of Maker/Debtor's Obligations under this Note ("Guarantor") dies or is materially disabled, ceases to do business, becomes insolvent, declares or is determined to be a Maker/Debtor under the bankruptcy code, or makes an assignment for the benefit of creditors; (d) any of the warranties, covenants or representations

made by Maker/Debtor or any Guarantor to Holder/Secured Party be or become untrue or incorrect in any respect; (e) a change in the management, operations, ownership of stock or membership units or control of Maker/Debtor; (f) Holder/Secured Party at any time deems the security afforded by this Note unsafe, inadequate or at any risk or any of the Collateral in danger of misuse, concealment or misappropriation. (g) any attachment, levy or execution against Maker/Debtor or any Guarantor that is not released within 60 hours; (h) Maker/Debtor's or any Guarantor's affairs so evolve such that, in Holder/Secured Party's sole discretion, Holder/Secured Party thereby becomes insecure as to the performance of this Note or any other agreement with Maker/Debtor; (i) Maker/Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation, other encumbrance (other than Holder/Secured Party's interest), or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral or any of Holder/Secured Party's interests under this Note or any of the Obligations; (j) Maker/Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (k) failure of Maker/Debtor to obtain or maintain insurance on the Collateral satisfactory to Holder/Secured Party in its sole discretion; or (l) any of the Obligations, this Note, the security interest granted herein or any provision hereof for any reason attributable to Maker/Debtor, ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Maker/Debtor or Maker/Debtor shall deny that it has any further liability or obligation thereunder.

18.  Upon any default by Maker/Debtor, the rate of interest shall automatically increase to the Default Rate, and Maker/Debtor shall immediately deliver possession of the Collateral to Holder/Secured Party, and Holder/Secured Party, without demand or notice, may exercise any of the following remedies: (a) Accelerate the maturity of and declare the  entire indebtedness under all or part of Obligations immediately due and payable; (b) Take possession of all or part the Collateral, at any time, wherever it may be, and to enter any premises, with or without process of law, and search for, take possession of, remove, or keep and store the Collateral on said premises until sold, without liability for trespass nor charge for storage; (c) Sell the Collateral or any part thereof and all of the Maker/Debtor's equity of redemption therein at public or private sale, for cash or on credit, and on such terms as Holder/Secured Party may in its sole discretion elect, in such county and at such places as Holder/Secured Party may elect and without having the Collateral at the place of sale.  In the event Holder/Secured Party sells all or part of the Collateral at public or private sale, then (i) Holder/Secured Party shall not be required to refurbish, repair or otherwise incur any expenses in preparing Collateral for sale but may sell its interest therein on an "AS-IS," "WHERE-IS" basis; (ii) Holder/Secured Party may bid or become the purchaser at any such sale and Maker/Debtor waives any and all rights of redemption from any such sale; (iii) Any public sale will be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before such sale and advertised in at least one newspaper of general circulation in the area of the sale at least twice prior to the date of sale and if upon terms of 25% cash down with the balance payable in good funds within 24 hours or other more favorable terms in the discretion of Holder/Secured Party; (iv) The proceeds of any public or private sale shall first be applied to the costs and expenses of Holder/Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions, and second to the payment, partly or entirely, of any of the Obligations as Holder/Secured Party may in its sole discretion elect, returning the excess, if any, to Maker/Debtor or such other party in interest as the required by law; Maker/Debtor shall remain liable to Holder/Secured Party for any deficiency plus interest thereon as provided above; (v) Any private sale shall be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before the sale date stated therein at the address indicated above, and credit given for the full price stated, less attorneys' fees costs and expenses. No action taken by Holder/Secured Party shall release Maker/Debtor from any of its Obligations to Holder/Secured Party. Maker/Debtor acknowledges and agrees that in any action or proceeding brought by Holder/Secured Party to obtain possession of any Collateral, Holder/Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Maker/Debtor and if Maker/Debtor contests Holder/Secured Party's right to possession of any Collateral in any action or proceeding, Maker/Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Maker/Debtor's unpaid Obligations to Holder/Secured Party, whichever is less. Holder/Secured Party may without prior notice to or demand upon Maker/Debtor and with or without the exercise of any of Holder/Secured Party's other rights or remedies, apply toward the payment of Maker/Debtor's Obligations (at any time owing to Holder/Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Maker/Debtor and coming into Holder/Secured Party's possession and for such purpose may endorse Maker/Debtor's name on any instrument or document payable to Maker/Debtor (whether for deposit, collection, discount or negotiation). Without notice to Maker/Debtor, Holder/Secured Party may apply such sums or change applications of sums previously paid and/or to be paid to Holder/Secured Party, to such Obligations as Holder/Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

19.  Maker/Debtor, at Holder/Secured Party's option, hereby irrevocably consents to the appointment of a receiver or keeper for the Collateral and/or all other property of Maker/Debtor, and of the rents, issued as proceeds thereof.  Maker/Debtor expressly waives any right to notice or hearing in any action to recover possession of any or all of the Collateral.  Any notices hereunder shall be in writing and effective when delivered in person to an officer of the party to whom addressed or mailed by certified mail to such party at its address specified herein or at such other address as may hereafter be specified by like notice by either party to the other.  Reasonable notification hereunder shall be any notification given or sent at least five (5) days prior to the event for which such notification is sent.  Maker/Debtor agrees that upon the request of Holder/Secured Party, after any default, to segregate and hold all or any part of the Collateral in a fiduciary capacity and to adequately maintain, service and insure said property and to protect same from use and/or abuse, all without charge to Holder/Secured Party, such fiduciary duty to terminate only upon the actual delivery of the Collateral to Holder/Secured Party.  Maker/Debtor, recognizing that in the event of default no remedy at law would provide adequate relief to Holder/Secured Party, agrees that Holder/Secured Party shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

**20.  MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREOF AGREE TO THE EXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN MECKLENBURG COUNTY, NORTH CAROLINA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSSCLAIMS ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS SECURITY AGREEMENT, WITH THE SOLE EXCEPTIONS THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF THE COLLATERAL OR ANY OTHER ASSETS OF THE MAKER/DEBTOR OR ANY GUARANTOR HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF THE HOLDER/SECURED PARTY, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE THE MAKER/DEBTOR, OR ANY GUARANTOR, OR THE COLLATERAL AND/OR ANY OTHER ASSETS OF THE MAKER/DEBTOR, OR GUARANTOR MAY BE LOCATED.  MAKER/DEBTOR AND HOLDER/SECURED PARTY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT IN ACCORDANCE HEREWITH.  MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSSCLAIMS AND SETOFF OR RECOUPMENT CLAIMS ARISING EITHER DIRECTLY OR INDIRECTLY BETWEEN OR AMONG THEM AND/OR INVOLVING ANY PERSON OR ENTITY CLAIMING ANY RIGHTS ACQUIRED BY, THROUGH OR UNDER ANY PARTY AND FURTHER WAIVE ANY AND ALL RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES.**

21.  Holder/Secured Party may at any time, with or without exercising any of the rights or remedies aforesaid and without prior notice or demand to Maker/Debtor, appropriate and apply toward the payment of the Obligations any and all balances, sums, property, credits, deposits, accounts, reserves, collections, drafts, notes or checks coming into Holder/Secured Party's possession and belonging or owing to Maker/Debtor, and

COPYRIGHT | 2017 COMMERCIAL CREDIT GROUP INC.

for such purposes, endorse the name of Maker/Debtor on any such instrument made payable to Maker/Debtor for deposit, negotiation, discount or collection. Such applications may be made, or any monies paid to Holder/Secured Party may be applied, without notice to Maker/Debtor, partly or entirely to such of the Obligations as Holder/Secured Party in its sole discretion may elect. In its sole discretion Holder/Secured Party may apply and/or change applications of any sums paid and/or to be paid by or for Maker/Debtor, under any circumstances, to any obligations of Maker/Debtor to Holder/Secured Party, presently existing or otherwise. The interest rates which may be provided for in any instrument evidencing one or more Obligations shall in no event, circumstance or contingency exceed any maximum permitted by applicable law.

22. No failure to exercise, no delay in exercising, and no single or partial exercise on the part of Holder/Secured Party of any right, privilege, remedy, or power under the Note, shall operate as a waiver thereof or preclude Holder/Secured Party from exercising any other right, privilege, remedy or power under this Note whether or not Maker/Debtor is in default hereunder. No waiver of any provision of the Note shall be effective unless in writing, signed by a duly authorized officer of the party to be charged, and no amendment, supplement or other modification of the Note shall be effective unless in writing signed by each of the parties hereto. This instrument constitutes the entire agreement between the parties. This Note cannot be modified or terminated orally. Only a written instrument, signed by an officer of the Holder/Secured Party, shall be effective to modify or terminate any obligation of Maker/Debtor to Holder/Secured Party, this Note or any other agreement between the parties but only to the extent therein specifically set forth therein. All other entities controlled by Commercial Credit, Inc. shall include Commercial Funding Inc.

23. This Note may be assigned along with any and all Obligations, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise, and such assignee shall be entitled to at least the same rights as Holder/Secured Party. All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee, transferee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of and shall bind the representatives, successors and assigns of the respective parties.

24. Some of the Collateral may be in the hands of Maker/Debtor under one or more security agreements, installment sale contracts, lease agreements, notes or other instruments which are or may be held by Holder/Secured Party and with respect to such Collateral. Holder/Secured Party by accepting this Note shall not in any manner be considered as having waived any security interest arising independently of this Note nor shall this Note be construed as adversely affecting any rights of Holder/Secured Party under any other security agreement nor as a waiver of any of the terms and provisions of any other security agreement, guaranty or endorsement in favor of Holder/Secured Party, all of which shall remain and continue in full force and effect and shall be cumulative.

25. Intending that each and every provision of this Note be fully effective and enforceable according to its terms, the parties agree that the validity, enforceability and effectiveness of each provision hereof and the obligations, rights and remedies of the Maker/Debtor and Holder/Secured Party in any way related to or arising under this Note or under one or more Obligation shall be governed by and construed in accordance with the laws of the State of Delaware (excluding its choice of law rules). If any one or more provisions hereof are in conflict with any statute or law and thus not valid or enforceable, then each such provision shall be deemed null and void but only to the extent of such conflict and without invalidating or affecting the remaining provisions hereof. This contract shall be binding upon the heirs, administrators, legal representatives and successors of the Maker/Debtor.

**26. DESCRIPTION OF PROPERTY**

| Quantity | Year | Manufacturer | Model | Specifications | Serial Number |
|---|---|---|---|---|---|
| 1 | 2013 | Peterbilt | 389 | 70" Ultra sleeper with a with a Cummins 500hp engine, 18 speed transmission and all aluminum wheels. | 1XPXD49X8DD189066 |
| 1 | 2011 | Utility | Reefer | 53' x 102" Refrigerated trailer with a Thermo King SB310 refrigeration unit (S/N: K68748) | 1UYVS253XBU186111 |

Each including all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including any rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing.

**27. THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.**

The undersigned, if more than one, shall be jointly and severally liable hereunder and all provisions hereof shall apply to each of them.

IN WITNESS WHEREOF, Maker/Debtor has caused these presents to be duly executed, the day and year first above written.
MAKER/DEBTOR/:
**Zaid Carriers LLC**
(Debtor)          (Seal)

By: _____ member
                                      (Title)

_____
(Witness to Debtor's Signature)
Address: 1405 Encantado Circle Mission TX, 78572

# FIRST AMENDMENT
## TO SECURITY AGREEMENT

Date: <u>July 23, 2018</u>

WHEREAS Zaid Carriers LLC ("Debtor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement of even date herewith in which Debtor granted to <u>Commercial Credit Group Inc.</u> ("Secured Party") security interests in Debtor's property described therein, which includes specific items of titled equipment and/or motor vehicles (the "Titled Collateral"); and

WHEREAS Debtor hereby acknowledges that it must expediently provide to Secured Party evidence of the completion of certain requirements, such as obtaining signed VIN inspection forms, signed weight tickets, paying excise and other taxes, as well as registration and applicable fees, in order to properly title and record Secured Party's lien against the items of Titled Collateral with the Debtor's state title-issuing authority;

WHEREAS Debtor further acknowledges that Secured Party has funded the loan secured by the Titled Collateral in reliance upon Debtor's promise herein to pay such taxes and fees to the titling authority, and timely forward to Secured Party such signed VIN inspections forms, weight tickets and other documents as are required by the titling authority to properly title and record Secured Party's lien against the Titled Collateral;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Debtor agrees as follows:

1.    Within seven (7) business days of delivery of the Titled Collateral, Debtor shall deliver to Secured Party, to the attention of the Lien Department, original signed VIN inspection forms, weight tickets and any other documents required by the titling authority to properly title and record Secured Party's lien on the Certificate(s) of Title to the Titled Collateral.

2.    Within two (2) business days of Secured Party's delivery to the titling authority of applications for Certificates of Title to the items of Titled Collateral, Debtor shall deliver to the titling authority full payment for all taxes and fees required by the titling authority to issue Certificates of Title, registrations and license plates for the Titled Collateral.

3.    The Debtor's failure to: (a) timely deliver to Secured Party original signed forms and any other evidence of completion of items described above in section 1, or (b) timely pay to the titling authority all taxes and fees required by the titling authority in order for it to issue Certificates of Title for each item of the Titled Collateral, **SHALL CONSTITUTE AN EVENT OF DEFAULT UNDER THE SECURITY AGREEMENT, THEREBY ENTITLING SECURED PARTY TO ANY AND ALL LEGAL AND CONTRACTUAL REMEDIES AVAILABLE AGAINST THE DEBTOR AND ANY COLLATERAL INCLUDING, WITHOUT LIMITATION, REPOSSESSION AND LIQUIDATION OF THE TITLED COLLATERAL WITHOUT NOTICE.**

4.    This Amendment shall be considered a part of, and be construed together with, the Security Agreement of even date herewith.

IN WITNESS WHEREOF, Debtor has caused this Amendment to be executed on the date set forth above.

**Zaid Carriers LLC**

By: _____   member
                                    (Title)

_____
(Witness to Signature)

## AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date:  January 22, 2020

WHEREAS,  Zaid  Carriers  LLC      as  Obligor,  Maker  or  Lessee  ("Obligor")  has  executed  and  delivered  a  certain  Negotiable  Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated July 23, 2018      and payable to the order of **Commercial Credit Group Inc.,** its successors and assigns ("CCG"), with installment payments originally totaling $104,860.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Paper is $43,616.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on March 5, 2020 and on the 5th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Paper, as follows:

          10   Installment(s) each in the amount of  $3,745.00        Followed By
           1   Installment(s) each in the amount of  $6,166.00

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Extension had never been entered into.  As further consideration for CCG's agreement to the terms of this Extension, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind,, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Paper and/or this Extension, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations.

Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Paper is and will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Paper or otherwise. Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained. Any promissory note made and delivered by Obligor to CCG in connection with this Extension shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Extension shall not diminish or prejudice CCG's rights or alter CCG's position under the Paper. Except as expressly modified by this Extension, all terms, conditions and provisions of the Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Paper, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.

IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above

**Commercial Credit Group Inc.**

By: _____
                                    Title

**Zaid Carriers LLC**
(Obligor)

By: _____ | Manager
                                    Title

DocuSign Envelope ID: 59FC32A1-5415-4BBE-9EAA-9A39CA539D4B
Case 7:22-cv-00083   Document 30   Filed on 10/12/22 in TXSD   Page 33 of 59
This is a copy view of the Authoritative Copy h
by the designated custodian

## SECOND AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date: July 02, 2020

WHEREAS, Zaid Carriers LLC as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated January 24, 2018 and payable to the order of **COMMERCIAL CREDIT GROUP INC.**, its successors and assigns ("CCG"), with installment payments originally totaling $108,528.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper) as modified by an Amendment to Negotiable Promissory Note and Security Agreement / Lease / Conditional Sale Contract ("Prior Amendment") dated January 03, 2020(collectively, with the Paper, the "Amended Paper"); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Amended Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Amended Paper is $45,640.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on August 15, 2020 and on the 15th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Amended Paper, as follows:

    10   Installment(s) each in the amount of $2,848.00        Followed By
    1    Installment(s) each in the amount of $17,160.00

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Amended Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees) damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Amended Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Amendment and the Prior Amendment had never been entered into. As further consideration for CCG's agreement to the terms of this Amendment, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Amended Paper and/or this Amendment, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations. Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Amended Paper is and will continue to be vested in CCG, its successors and assigns, until Obligor has

EZ.EXT.SEC.0320F

DocuSign Envelope ID: 59FC32A1-541F-46BE-9EAA-9A39CA539B4B
Case 7:22-cv-00083    Document 30    Filed on 10/12/22 in TXSD    Page 34 of 59
This is a copy view of the Authoritative Copy
by the designated custodian

fully paid and performed all Obligations to CCG, with interest, whether under the Amended Paper or otherwise. Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained. Any promissory note made and delivered by Obligor to CCG in connection with this Amendment shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Amendment shall not diminish or prejudice CCG's rights or alter CCG's position under the Amended Paper. Except as expressly modified by this Amendment, all terms, conditions and provisions of the Amended Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Amended Paper, the Property or this Amendment more than six (6) months after such claim or cause of action accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.

IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above.

**Commercial Credit Group Inc.**

By: _Brad Cummins_          AVP – Operations
    Brad Cummins                Title
    D7C00F5803AE401...

**Zaid Carriers LLC**
**(Obligor)**

By: _Maribel Diaz_  Manager
    Maribel Diaz
    87E6C20C61F94EA...

# EXHIBIT A-4



**Commercial Credit Group**

## NEGOTIABLE PROMISSORY NOTE and SECURITY AGREEMENT (the "Note")

**$1,138,620.00**
Total Amount of Scheduled Note Payments

**September 06, 2018**
Date

**Zaid Carriers LLC**
**("MAKER/DEBTOR")**

For value received, the undersigned (hereinafter referred to as "Maker/Debtor"), jointly and severally if more than one, irrevocably and unconditionally promises to pay to the order of <u>Commercial Credit Group Inc.</u>, its successor or assigns (hereinafter referred to "Holder/Secured Party") at <u>2135 City Gate Lane, Suite 440, Naperville, IL. 60563</u> or such other place as the Holder/Secured Party hereof may from time to time appoint, the sum of <u>One Million One Hundred Thirty-Eight Thousand Six Hundred Twenty And 00/100 Dollars ($1,138,620.00)</u> in consecutive monthly installments as follows:

| 1 | Installment(s) each in the amount of  $37,954.00 Followed By |
| 58 | Installment(s) each in the amount of  $18,977.00 |

1.    The first Installment shall be due on 09/06/2018 . The second Installment shall be due on 10/15/2018 and each of the remaining consecutive monthly Installments shall be due on the same date of each month thereafter until the indebtedness under this Note is paid in full. The Total Amount of Scheduled Note Payments includes pre-computed interest (at the "non default interest rate"). Maker/Debtor on demand shall pay a late charge of 5% of any installment that has not been fully paid prior to the seventh day after its due date ("Late Charge") and, upon Maker/Debtor's default or after maturity, whether by acceleration or otherwise, to the extent permitted by applicable law, interest on the entire unpaid balance (excluding accrued and unpaid interest) at the maximum lawful rate permitted by law not to exceed eighteen percent (18.0%) per annum (the "Default Rate") until this Note is paid in full, plus all collection and other charges, and if placed in the hands of an attorney for collection, attorneys' fees, costs and expenses.  Unless prohibited by applicable law, during any period of time when Maker/Debtor is in default under the terms of this Note, Maker/Debtor shall pay interest on the unpaid principal amount outstanding from time to time at the maximum lawful daily rate, not to exceed the Default Rate, in place of the non-default interest rate payable hereunder, until the default is cured.  In no event shall any late charge or the Default Rate charged hereunder exceed any maximum permitted by law.  Interest shall be computed on the basis of a 360 day year and for the actual number of days elapsed, unless such calculation would cause the effective interest rate to exceed the maximum rate allowed by applicable law, in which case such calculation shall be computed on the basis of a 365 day year.

2.    If any payment is not made when due, or if there is a default by Maker/Debtor under any present or future agreement with Holder/Secured Party or with any other entity controlled by Commercial Credit, Inc. or a default of any guarantor of Maker/Debtor's obligations under this Note or any agreement with any other entity controlled by Commercial Credit, Inc., all remaining payments shall, at the option of the Holder/Secured Party, without notice, become immediately due and payable, and the unpaid balance shall bear interest at the Default Rate until paid in full.  All installments and other sums received by Holder/Secured Party shall be applied first to interest, late charges, costs, fees and expenses, and then to principal hereunder.

3.    Maker/Debtor, any endorsers and any other persons obligated hereon shall: (a) agree that the Holder/Secured Party may, without limit, grant to any one or more of them extensions of the time for payment of this Note and/or the maturity of any payment or payments, in whole or in part; (b) waive presentation for payment, demand for payment, notice of non-payment or dishonor, protest and notice of protest, notice of default and/or dishonor, and notice of the intent to accelerate and/or acceleration of the indebtedness evidenced hereby; (c) waive the benefits of any statute of limitations with respect to any action to enforce, or otherwise related to, this Note; (d) agree that the failure or delay to perfect or continue the perfection of any security interest in any property or collateral which secures the obligations of the Maker/Debtor or any endorser or other person obligated hereon, or to protect the property or collateral covered by such security interest, if any, shall not release or discharge them or any of them; (e) agree this Note is made and shall be construed under the laws of the State of Delaware; (f) agree all exemptions and homestead laws and all rights thereunder are hereby waived to the extent permitted by law; (g) agree that all amounts due hereunder are absolutely due and owing and are not subject to any claim, counterclaim, or set off of any kind, and hereby waive any claim(s) whatsoever each may have against Holder/Secured Party, whether known or unknown, as of the date of this Note; (h) agree that Holder/Secured Party may, without notice, extend the time of payment of this Note, postpone the enforcement hereof, grant any other indulgence, add or release any party primarily or secondarily liable hereon and/or release or change any collateral securing this Note without affecting or diminishing Holder/Secured Party's right of recourse against Maker/Debtor, all endorsers, guarantors and other parties liable on this Note, which rights are hereby expressly reserved. Holder/Secured Party may settle with, grant forbearance to, or release any Maker/Debtor, endorser, guarantors or other parties liable on this Note without notice, and any such settlement, forbearance or release shall not operate to release any other person or party liable hereunder; and (i) agree that Maker/Debtor's obligations hereunder shall be secured by any security agreement, mortgage, deed of trust or pledge executed by Maker/Debtor in favor of Holder/Secured Party, whether now existing or hereafter executed.

4.    In the event that any one or more of the provisions of this Note shall, for any reason, be held to be invalid, illegal or unenforceable, the same shall not affect any other provision of this Note and the remaining provisions of this Note shall remain in full force and effect.  No failure by Holder/Secured Party to exercise, and no delay in exercising any right or power hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise by the Holder/Secured Party of any right or power hereunder preclude any other or further exercise thereof, or the exercise of any other right or power.  No waiver or modification of any of the terms or provisions of this Note shall be valid or binding unless set forth in a writing signed by a duly authorized officer of Holder/Secured Party, and then only to the extent specifically set forth therein.

5.    As used in this Note, the term "Holder/Secured Party" includes any future Holder/Secured Party of this Note. Holder/Secured Party and its assignees may assign this Note, in whole or in part, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise.  All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of, and shall bind the representatives, successors and assigns of the respective parties.

6.    Maker/Debtor may, subject to the terms and conditions contained herein, prepay this Note in full or in part at any time, provided Maker/Debtor shall: (i) give five days prior written notice to Holder/Secured Party specifying the principal amount and date of any proposed voluntary prepayment and the indebtedness being voluntarily prepaid; (ii) pay the amount specified in such voluntary prepayment notice, in good funds, on the date specified in such notice; (iii) simultaneously pay, in good funds, all principal, interest, late charges, and other charges accrued and/or due to Holder/Secured Party through the date of any such voluntary prepayment; and (iv) simultaneously pay a prepayment premium equal to

the sum of .00167 of the principal amount then being voluntarily prepaid multiplied by the number of whole or partial calendar months between the date of the voluntary prepayment and the scheduled final maturity date of the indebtedness being prepaid but not more than the maximum amount permitted by law. The principal amount of any voluntary partial prepayment shall be applied in any manner acceptable to the Holder/Secured Party in the Holder/Secured Party's sole discretion including to the scheduled installments of the indebtedness then being prepaid in the reverse order of their respective maturities, so that the amount and due date of only the latest maturing installment(s) shall be affected thereby.

7.      The proceeds from the loan evidenced by this Note are to be used for business purposes only, and no part thereof is to be used for primarily consumer, personal, family or household purposes. If more than one party signs this Note as Maker/Debtor, the obligations of each of them shall be joint and several. Notwithstanding anything to the contrary in this Note or any related writing, all agreements between Maker/Debtor and Holder/Secured Party, whether now existing or hereafter arising and whether written or oral, are hereby limited so that in no event, whether by reason of demand for payment or acceleration of maturity or otherwise, shall the interest contracted for, charged or received by Holder/Secured Party exceed the maximum amount permitted under applicable law. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise been earned on the date of such acceleration, and Holder/Secured Party does not intend to charge or collect any unearned interest in the event of acceleration. If, from any circumstance whatsoever, interest would otherwise be payable to Holder/Secured Party in excess of the maximum lawful amount, the interest payable to Holder/Secured Party shall be reduced to the maximum amount permitted under applicable law; and if from any circumstance Holder/Secured Party shall ever receive anything of value deemed interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive interest shall be applied to the reduction of the principal hereof and not to the payment of interest, or if such excessive interest exceeds the unpaid balance of the principal, to the extent permitted by applicable law, to other obligations of the Maker/Debtor owing to Holder/Secured Party, as Holder/Secured Party may determine, and thereafter any such excess shall be refunded to Maker/Debtor. All interest paid or agreed to be paid to Holder/Secured Party shall, to the extent permitted by applicable law, be amortized, prorated, and allocated throughout the full period until payment in full of the principal (including the period of any extension or renewal hereof) so that the interest here on for such full period shall not exceed the maximum permitted by applicable law. This paragraph shall control all agreements between Maker/Debtor and Holder/Secured Party.

8.      Maker/Debtor hereby authorizes Holder/Secured Party to disclose to third-parties certain financial information relating to Maker/Debtor which Holder/Secured Party has obtained or will hereafter obtain including but not limited to payment histories, balances and due dates.

9.      Disbursement of Loan Proceeds. The undersigned unconditionally and irrevocably authorizes and requests that Holder/Secured Party disburse the proceeds due Maker/Debtor from this Note as follows:

| $686,888.76 | To: | French Ellison Truck Center Pharr<br>4300 N Cage<br>Pharr, TX 78577 |
| $200,479.24 | To: | Commercial Credit Group Inc. on behalf of itself and on behalf of all Affiliates of CCI<br>2135 City Gate Lane, Suite 440<br>Naperville, IL 60563 |
| $900.00 | To: | Commercial Credit Group Inc. as a fully earned non-refundable documentation fee |

Payment as outlined above will in all respects be the equivalent of payment made directly to Maker/Debtor and represents the entire amount due Maker/Debtor. Holder/Secured Party shall not be obligated to see to the application thereof by the recipient. Maker/Debtor hereby warrants and represents that all proceeds disbursed pursuant to this Note are being used for commercial business purposes only and not for any personal, family or household use.

10. To secure the prompt payment, performance and fulfillment of any and all Obligations (as hereinafter defined) of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., Maker/Debtor hereby assigns, transfers, conveys, pledges, mortgages and grants to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest and lien in each and every one of the goods, chattels and property described in the herein Description of Property and any and all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, in which Maker/Debtor now or hereafter has any right or interest, and in any and all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing (collectively called "Collateral"). Maker/Debtor grants Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. a security interest in the Collateral to secure the Obligations.

11. The term "Obligations" as used herein shall mean and include: (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. to or on account of Maker/Debtor or which Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. have or will become obligated to make, grant or extend to or for the account of Maker/Debtor; and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, attorneys fees and costs and expenses hereto and/or hereafter chargeable against Maker/Debtor by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or owing by Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc., or upon which Maker/Debtor may be and/or has become liable as endorser or guarantor; and (c) all obligations and/or indebtedness of any and every kind of Maker/Debtor to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. whether direct or indirect, whether contingent or absolute, whether matured or un-matured, and whether now or in the future arising, existing, incurred, contracted or owing to Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. or acquired by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by Holder/Secured Party and all other entities controlled by Commercial Credit, Inc. directly from Maker/Debtor or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (d) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing.

12. All of the Obligations are acknowledged, affirmed and declared by Maker/Debtor to be secured by this Note. The Maker/Debtor agrees that it will fully and faithfully pay, perform and fulfill all of its Obligations. Maker/Debtor shall pay to Holder/Secured Party on demand, on any installment of the Obligations not fully paid prior to the seventh day (or such longer period as required by law) after its due date, a late charge of 5% of any such installment ("Late Charge") and, after any default or maturity, whether by acceleration or otherwise, interest on the Obligations at the rate of eighteen percent per annum (the "Default Rate") from the date of such default or maturity (whichever is earlier), until the Obligations are collected by the Holder/Secured Party in full. In addition, Maker/Debtor agrees to pay, on demand, all attorney fees, costs and expenses, collection costs and other charges incurred by Holder/Secured Party to enforce the payment and performance of Maker/Debtor's Obligations. Any interest rate, late charge, fee or other charge ("Charge") provided for in any way hereunder or under any document, note or instrument given in connection with any of the Obligations shall not in any event or contingency exceed any maximum permitted by applicable law and any such Charge shall be deemed hereby amended to such maximum amount. Any sums collected with respect to any Charge in excess of any maximum shall be applied to reduce the principal sum owing under the Obligations and any excess refunded to Maker/Debtor.

13. Maker/Debtor further represents and warrants to Holder/Secured Party and agrees as follows: (a) Maker/Debtor is the lawful owner of the Collateral and has paid all applicable sale, use or other taxes due in connection with the sale, purchase, ownership, possession or use of the Collateral and shall indemnify Holder/Secured Party from and against any loss, cost or expense, including penalties, interest and other charges of any kind in connection with or arising from the sale, purchase, ownership, possession or use of the Collateral; (b) The Collateral is in the possession of Maker/Debtor at its principal place of business (which is Maker/Debtor's address shown herein), unless a different location is specifically shown on Schedule A for any one or more items; (c) The Collateral and every part thereof is and will continue to be free and clear of all liens, attachments, levies, claims, demands and encumbrances of every kind, nature and description (except any held by Holder/Secured Party); (d) Maker/Debtor will defend the Collateral against all claims and demands of all persons and will not permit any circumstances to exist under which the Holder/Secured Party may lose its lien or lien priority on the Collateral; (e) Maker/Debtor will not sell, assign, mortgage, lease, pledge or otherwise dispose of the Collateral without the prior written consent of the Holder/Secured Party, and in the event of a sale or disposition of any item(s) of the Collateral, Maker/Debtor shall hold all proceeds therefrom in trust, and immediately deliver same to Holder/Secured Party; (f) Maker/Debtor, at its own cost and expense, will maintain and keep the Collateral in good repair, will not waste, abuse or destroy the Collateral or any part thereof and will not be negligent in the care and use thereof; (g) Maker/Debtor will not remove the Collateral from within the 48 contiguous States of the United States or its present locations without the prior written consent of the Holder/Secured Party nor change its present business locations without at least thirty days prior written notice to Holder/Secured Party; (h) At all times Maker/Debtor shall allow Holder/Secured Party or its representatives free access to and right of inspection of the Collateral, which shall remain personally and not become a part of any realty. Nothing shall prevent Holder/Secured Party from removing all or any part of the Collateral as Holder/Secured Party, in its sole discretion may determine, from any premises to which it may be attached and/or upon which it may be located. Maker/Debtor agrees to deliver to Holder/Secured Party all appropriate waivers which Holder/Secured Party may request in its absolute discretion, in a form satisfactory to Holder/Secured Party, of owners, landlords and mortgagees of any such premises on which the Collateral may be located from time to time; (i) Maker/Debtor shall insure that (so far as may be necessary to protect the Collateral and the lien of this Note thereon) all of the terms and conditions of any leases covering the premises wherein the Collateral may be located are consistent with and will not result in a violation hereof, and Maker/Debtor shall comply with any orders, ordinances, laws or statutes of any city, state, or other entity having jurisdiction over the premises or the conduct of business thereon, and, where requested by Holder/Secured Party, will correct any defects or execute any written instruments and do any other acts necessary to more fully execute the purposes and provisions of this Security Agreement; (j) Maker/Debtor has the sole right and lawful authority to enter into this Note and, if a corporation or limited liability company, the execution of this Note has been duly consented to and authorized by all of the stockholders or members of the Maker/Debtor and duly authorized by its Board of Directors or Managers as applicable.  Maker/Debtor agrees to deliver to Holder/Secured Party evidence thereof satisfactory to Holder/Secured Party immediately upon request; (k) Each person signing this Note has full authority to sign for the Maker/Debtor; (l) Maker/Debtor will indemnify and save Holder/Secured Party harmless from all losses, costs, damages, liabilities or expenses, including reasonable attorneys' fees, costs and expenses, that Holder/Secured Party may sustain or incur in connection with this Note or the Obligations, including any effort to obtain or enforce payment, performance or fulfillment of any of the Obligations or in the enforcement of, or foreclosure of Collateral under the terms of this Note or in the prosecution or defense of any action or proceeding either against Maker/Debtor or against Holder/Secured Party concerning any matter growing out of or connected with this Note and/or any of the Obligations and/or any of the Collateral. The aforementioned indemnity or any other indemnity obligation under this Note shall survive termination hereof; (m) At Holder/Secured Party's request Maker/Debtor will furnish current financial statements satisfactory to Holder/Secured Party in form, preparation and content; (n) no Blocked Person has or shall acquire an ownership interest in or control of Maker/Debtor. "Blocked Person" means any person or entity that is now or at any time (i) on a list of Specially Designated Nationals issued by the Office of Foreign Assets Control ("OFAC") of the United States Department of the Treasury or any sectoral sanctions identification list, or (ii) whose property or interests in property are blocked by OFAC or who is subject to sanctions imposed by law, including any executive order of any branch or department of the United States government or (iii) otherwise designated by the United States or any regulator having jurisdiction or regulatory oversight over Holder, to be a person with whom Holder is not permitted to extend credit to or with regard to whom, a lending relationship may result in penalties against Holder or limitations on a holder's ability to enforce a transaction.

14. To secure all the Obligations Maker/Debtor authorizes Holder/Secured Party to file one or more financing statements and/or a reproduction hereof as a financing statement, and any other lien-related forms or documents relating to the Collateral, from time to time as Holder/Secured Party deems in its sole discretion appropriate, in any jurisdiction (and Maker/Debtor shall execute any financing statement or amendment thereto) and Maker/Debtor hereby irrevocably appoints Holder/Secured Party as the true and lawful Attorney-in-Fact of Maker/Debtor, coupled with an interest, with full power in Maker/Debtor's name, place and stead to execute financing statements on Maker/Debtor's behalf and to do any and all other acts on Maker/Debtor's behalf necessary or helpful to perfect and continue perfection of Holder/Secured Party's security interest in the Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the Collateral on the attached Description of Property and/or on any documents related hereto. Maker/Debtor hereby consents to the use and installation on the Collateral (at Holder/Secured Party's option and expense) of global positioning or similar hardware that monitors the location of the Collateral. Maker/Debtor may not remove or disable such hardware without the written consent of the Holder/Secured Party. If installed, Maker/Debtor shall be responsible for damage to or removal of such hardware without Holder/Secured Party's prior written consent.  All such hardware and information obtained therefrom shall be owned exclusively by the Holder/Secured Party, and may be disabled or removed from the Collateral by Holder/Secured Party without notice of any kind. The hardware and services it facilitates are for the sole use of the Holder/Secured Party and Maker/Debtor releases and holds Holder/Secured Party harmless from the use of any such hardware or the information obtained.

15. Maker/Debtor will insure the Collateral, at its sole cost and expenses, by maintaining an "all risks" insurance policy naming the Holder/Secured Party as additional insured and loss payee, in an amount at least equal to the full replacement value of all Collateral identified in the Description of Property and also, where requested by Holder/Secured Party, against other hazards (including but not limited to comprehensive general liability insurance), with companies, in amounts of coverage and deductible provisions, and under policies acceptable to Holder/Secured Party. Each policy shall be delivered to Holder/Secured Party and shall expressly state that insurance as to Holder/Secured Party shall not be invalidated by any act, omission or neglect of Maker/Debtor and that the insurer shall give thirty (30) days written notice to Holder/Secured Party of any alteration, termination or cancellation of the policy. Holder/Secured Party shall have the right, but not the obligation, to provide insurance for its interest and charge Maker/Debtor Holder/Secured Party's cost for such insurance, together with it or its designee's customary charges or fees associated with its insurance. Maker/Debtor hereby irrevocably appoints Holder/Secured Party as Maker/Debtor's Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto.

16. If Maker/Debtor shall be in default in the full, prompt and faithful performance of any of the terms, conditions and provisions of this Note, Holder/Secured Party may, at its option, (but shall not be obligated to), without waiving its right to enforce this Security Agreement according to its terms, immediately or at any time thereafter, and without notice to or demand upon Maker/Debtor, perform or cause the performance of such terms, conditions or provisions, for the account and at the sole cost and expense of Maker/Debtor, which (including reasonable attorneys' fees, costs and expenses) shall be secured by the Collateral, added to the amount of the Obligations, without notice to Maker/Debtor, and shall be payable on demand with interest at the Default Rate specified in Paragraph 1 hereof.

17. Maker/Debtor shall be in default upon the occurrence of any of the following: (a) Maker/Debtor defaults in the prompt payment, performance or fulfillment of any of Maker/Debtor's Obligations; (b) Maker/Debtor shall fail to punctually and faithfully fulfill, observe or perform any of the terms, conditions, provisions, representations and warranties contained in this Note, the Obligations, or in any present or future agreement or instrument made by Maker/Debtor and then held by Holder/Secured Party; (c) Maker/Debtor or any guarantor of any of Maker/Debtor's Obligations under this Note ("Guarantor") dies or is materially disabled, ceases to do business, becomes insolvent, declares or is determined to be a Maker/Debtor under the bankruptcy code, or makes an assignment for the benefit of creditors; (d) any of the warranties, covenants or representations

made by Maker/Debtor or any Guarantor to Holder/Secured Party be or become untrue or incorrect in any respect; (e) a change in the management, operations, ownership of stock or membership units or control of Maker/Debtor; (f) Holder/Secured Party at any time deems the security afforded by this Note unsafe, inadequate or at any risk or any of the Collateral in danger of misuse, concealment or misappropriation. (g) any attachment, levy or execution against Maker/Debtor or any Guarantor that is not released within 60 hours; (h) Maker/Debtor's or any Guarantor's affairs so evolve such that, in Holder/Secured Party's sole discretion, Holder/Secured Party thereby becomes insecure as to the performance of this Note or any other agreement with Maker/Debtor; (i) Maker/Debtor shall incur, create, assume, cause or suffer to exist any mortgage, trust, lien, security interest, pledge, hypothecation, other encumbrance (other than Holder/Secured Party's interest), or attachment or execution of any kind whatsoever upon, affecting or with respect to the Collateral or any of Holder/Secured Party's interests under this Note or any of the Obligations; (j) Maker/Debtor shall sell, pledge, assign, rent, lease, lend, destroy or otherwise transfer or dispose of any Collateral; (k) failure of Maker/Debtor to obtain or maintain insurance on the Collateral satisfactory to Holder/Secured Party in its sole discretion; or (l) any of the Obligations, this Note, the security interest granted herein or any provision hereof for any reason attributable to Maker/Debtor, ceases to be in full force and effect or shall be declared to be null and void or the validity or enforceability thereof shall be contested by Maker/Debtor or Maker/Debtor shall deny that it has any further liability or obligation thereunder.

18. Upon any default by Maker/Debtor, the rate of interest shall automatically increase to the Default Rate, and Maker/Debtor shall immediately deliver possession of the Collateral to Holder/Secured Party, and Holder/Secured Party, without demand or notice, may exercise any of the following remedies: (a) Accelerate the maturity of and declare the entire indebtedness under all or part of Obligations immediately due and payable; (b) Take possession of all or part the Collateral, at any time, wherever it may be, and to enter any premises, with or without process of law, and search for, take possession of, remove, or keep and store the Collateral on said premises until sold, without liability for trespass nor charge for storage; (c) Sell the Collateral or any part thereof and all of the Maker/Debtor's equity of redemption therein at public or private sale, for cash or on credit, and on such terms as Holder/Secured Party may in its sole discretion elect, in such county and at such places as Holder/Secured Party may elect and without having the Collateral at the place of sale. In the event Holder/Secured Party sells all or part of the Collateral at public or private sale, then (i) Holder/Secured Party shall not be required to refurbish, repair or otherwise incur any expenses in preparing Collateral for sale but may sell its interest therein on an "AS-IS," "WHERE-IS" basis; (ii) Holder/Secured Party may bid or become the purchaser at any such sale and Maker/Debtor waives any and all rights of redemption from any such sale; (iii) Any public sale will be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before such sale and advertised in at least one newspaper of general circulation in the area of the sale at least twice prior to the date of sale and if upon terms of 25% cash down with the balance payable in good funds within 24 hours or other more favorable terms in the discretion of Holder/Secured Party; (iv) The proceeds of any public or private sale shall first be applied to the costs and expenses of Holder/Secured Party including but not limited to recovering, transporting, storing, refurbishing, and/or selling the items sold, attorneys' fees, court costs, bond and insurance premiums, advertising, postage and publishing costs, and sales commissions, and second to the payment, partly or entirely, of any of the Obligations as Holder/Secured Party may in its sole discretion elect, returning the excess, if any, to Maker/Debtor or such other party in interest as the required by law; Maker/Debtor shall remain liable to Holder/Secured Party for any deficiency plus interest thereon as provided above; (v) Any private sale shall be deemed commercially reasonable if notice thereof shall be mailed to Maker/Debtor at least 10 days before the sale date stated therein at the address indicated above, and credit given for the full price stated, less attorneys' fees costs and expenses. No action taken by Holder/Secured Party shall release Maker/Debtor from any of its Obligations to Holder/Secured Party. Maker/Debtor acknowledges and agrees that in any action or proceeding brought by Holder/Secured Party to obtain possession of any Collateral, Holder/Secured Party shall be entitled to issuance of a writ or order of possession (or similar legal process) without the necessity of posting a bond, security or other undertaking which is hereby waived by Maker/Debtor and if Maker/Debtor contests Holder/Secured Party's right to possession of any Collateral in any action or proceeding, Maker/Debtor shall post a bond (issued by a national insurer authorized to issue such bonds in the jurisdiction of such action or proceeding) in an amount equal to twice the amount in controversy in such action or proceeding or twice the amount of Maker/Debtor's unpaid Obligations to Holder/Secured Party, whichever is less. Holder/Secured Party may without prior notice to or demand upon Maker/Debtor and with or without the exercise of any of Holder/Secured Party's other rights or remedies, apply toward the payment of Maker/Debtor's Obligations (at any time owing to Holder/Secured Party) any checks, drafts, notes, balances, reserves, accounts and sums belonging to or owing to Maker/Debtor and coming into Holder/Secured Party's possession and for such purpose may endorse Maker/Debtor's name on any instrument or document payable to Maker/Debtor (whether for deposit, collection, discount or negotiation). Without notice to Maker/Debtor, Holder/Secured Party may apply such sums or change applications of sums previously paid and/or to be paid to Holder/Secured Party, to such Obligations as Holder/Secured Party in its sole discretion may choose. The exercise or partial exercise of any remedy shall not be construed as a waiver of any other remedy nor constitute an election of remedies.

19. Maker/Debtor, at Holder/Secured Party's option, hereby irrevocably consents to the appointment of a receiver or keeper for the Collateral and/or all other property of Maker/Debtor, and of the rents, issued as proceeds thereof. Maker/Debtor expressly waives any right to notice or hearing in any action to recover possession of any or all of the Collateral. Any notices hereunder shall be in writing and effective when delivered in person to an officer of the party to whom addressed or mailed by certified mail to such party at its address specified herein or at such other address as may hereafter be specified by like notice by either party to the other. Reasonable notification hereunder shall be any notification given or sent at least five (5) days prior to the event for which such notification is sent. Maker/Debtor agrees that upon the request of Holder/Secured Party, after any default, to segregate and hold all or any part of the Collateral in a fiduciary capacity and to adequately maintain, service and insure said property and to protect same from use and/or abuse, all without charge to Holder/Secured Party, such fiduciary duty to terminate only upon the actual delivery of the Collateral to Holder/Secured Party. Maker/Debtor, recognizing that in the event of default no remedy at law would provide adequate relief to Holder/Secured Party, agrees that Holder/Secured Party shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

20. **MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREOF AGREE TO THE EXCLUSIVE VENUE AND JURISDICTION OF ANY STATE OR FEDERAL COURT PRESIDING IN MECKLENBURG COUNTY, NORTH CAROLINA FOR ALL ACTIONS, PROCEEDINGS, CLAIMS, COUNTERCLAIMS OR CROSSCLAIMS ARISING DIRECTLY OR INDIRECTLY IN CONNECTION WITH, OUT OF, OR IN ANY WAY RELATED TO THIS SECURITY AGREEMENT, WITH THE SOLE EXCEPTIONS THAT AN ACTION TO RECOVER POSSESSION OF ALL OR PART OF THE COLLATERAL OR ANY OTHER ASSETS OF THE MAKER/DEBTOR OR ANY GUARANTOR HOWEVER DENOMINATED, MAY, IN THE SOLE DISCRETION OF THE HOLDER/SECURED PARTY, BE BROUGHT IN A STATE OR FEDERAL COURT HAVING JURISDICTION OVER THE COLLATERAL, AND/OR SUCH OTHER ASSETS, AND THAT JUDGMENTS MAY BE CONFESSED, ENTERED, OR ENFORCED IN ANY JURISDICTION WHERE THE MAKER/DEBTOR, OR ANY GUARANTOR, OR THE COLLATERAL AND/OR ANY OTHER ASSETS OF THE MAKER/DEBTOR, OR GUARANTOR MAY BE LOCATED. MAKER/DEBTOR AND HOLDER/SECURED PARTY WAIVE ANY RIGHT THEY OR ANY OF THEM MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT IN ACCORDANCE HEREWITH. MAKER/DEBTOR AND HOLDER/SECURED PARTY HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY AND ALL RIGHT TO A TRIAL BY JURY OF ANY AND ALL CLAIMS, DEFENSES, COUNTERCLAIMS, CROSSCLAIMS AND SETOFF OR RECOUPMENT CLAIMS ARISING EITHER DIRECTLY OR INDIRECTLY BETWEEN OR AMONG THEM AND/OR INVOLVING ANY PERSON OR ENTITY CLAIMING ANY RIGHTS ACQUIRED BY, THROUGH OR UNDER ANY PARTY AND FURTHER WAIVE ANY AND ALL RIGHT TO CLAIM OR RECOVER ANY PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO ACTUAL DAMAGES.**

21. Holder/Secured Party may at any time, with or without exercising any of the rights or remedies aforesaid and without prior notice or demand to Maker/Debtor, appropriate and apply toward the payment of the Obligations any and all balances, sums, property, credits, deposits, accounts, reserves, collections, drafts, notes or checks coming into Holder/Secured Party's possession and belonging or owing to Maker/Debtor, and

Note.B.CCG.0518F          Original        Page | 4

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

for such purposes, endorse the name of Maker/Debtor on any such instrument made payable to Maker/Debtor for deposit, negotiation, discount or collection. Such applications may be made, or any monies paid to Holder/Secured Party may be applied, without notice to Maker/Debtor, partly or entirely to such of the Obligations as Holder/Secured Party in its sole discretion may elect. In its sole discretion Holder/Secured Party may apply and/or change applications of any sums paid and/or to be paid by or for Maker/Debtor, under any circumstances, to any obligations of Maker/Debtor to Holder/Secured Party, presently existing or otherwise. The interest rates which may be provided for in any instrument evidencing one or more Obligations shall in no event, circumstance or contingency exceed any maximum permitted by applicable law.

22. No failure to exercise, no delay in exercising, and no single or partial exercise on the part of Holder/Secured Party of any right, privilege, remedy, or power under the Note, shall operate as a waiver thereof or preclude Holder/Secured Party from exercising any other right, privilege, remedy or power under this Note whether or not Maker/Debtor is in default hereunder. No waiver of any provision of the Note shall be effective unless in writing, signed by a duly authorized officer of the party to be charged, and no amendment, supplement or other modification of the Note shall be effective unless in writing signed by each of the parties hereto. This instrument constitutes the entire agreement between the parties. This Note cannot be modified or terminated orally. Only a written instrument, signed by an officer of the Holder/Secured Party, shall be effective to modify or terminate any obligation of Maker/Debtor to Holder/Secured Party, this Note or any other agreement between the parties but only to the extent therein specifically set forth therein. All other entities controlled by Commercial Credit, Inc. shall include Commercial Funding Inc.

23. This Note may be assigned along with any and all Obligations, without notice to Maker/Debtor, and upon such assignment Maker/Debtor agrees not to assert against any assignee hereof any defense, set-off, recoupment, claim, counterclaim or cross-claim which Maker/Debtor may have against Holder/Secured Party, whether arising hereunder or otherwise, and such assignee shall be entitled to at least the same rights as Holder/Secured Party. All of the rights, remedies, options, privileges and elections given to the original Holder/Secured Party hereunder shall inure to the benefit of any assignee, transferee or Holder/Secured Party of this Note, and their respective successors and assigns, and all the terms conditions, promises, covenants, provisions and warranties of this Note shall inure to the benefit of and shall bind the representatives, successors and assigns of the respective parties.

24. Some of the Collateral may be in the hands of Maker/Debtor under one or more security agreements, installment sale contracts, lease agreements, notes or other instruments which are or may be held by Holder/Secured Party with respect to such Collateral. Holder/Secured Party by accepting this Note shall not in any manner be considered as having waived any security interest arising independently of this Note nor shall this Note be construed as adversely affecting any rights of Holder/Secured Party under any other security agreement nor as a waiver of any of the terms and provisions of any other security agreement, guaranty or endorsement in favor of Holder/Secured Party, all of which shall remain and continue in full force and effect and shall be cumulative.

25. Intending that each and every provision of this Note be fully effective and enforceable according to its terms, the parties agree that the validity, enforceability and effectiveness of each provision hereof and the obligations, rights and remedies of the Maker/Debtor and Holder/Secured Party in any way related to or arising under this Note or under one or more Obligation shall be governed by and construed in accordance with the laws of the State of Delaware (excluding its choice of law rules). If any one or more provisions hereof are in conflict with any statute or law and thus not valid or enforceable, then each such provision shall be deemed null and void but only to the extent of such conflict and without invalidating or affecting the remaining provisions hereof. This contract shall be binding upon the heirs, administrators, legal representatives and successors of the Maker/Debtor.

### 26. DESCRIPTION OF PROPERTY

| Quantity | Year | Manufacturer | Model | Specifications | Serial Number |
|---|---|---|---|---|---|
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X7KJ278412 |
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X9KJ278413 |
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X0KJ278414 |
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X2KJ278415 |
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X4KJ278416 |
| 1 | 2019 | Kenworth | T680 | Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper | 1XKYD49X6KJ278417 |

Each including all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including any rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and to all of the foregoing.

**27. THIS WRITTEN AGREEMENT AND ALL OTHER DOCUMENTS EXECUTED IN CONNECTION HEREWITH REPRESENT THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS OR SUBSEQUENT ORAL AGREEMENTS BETWEEN THE PARTIES. THERE ARE NO UNWRITTEN AGREEMENTS BETWEEN THE PARTIES. THIS NOTE MAY NOT BE CHANGED OR TERMINATED ORALLY.**

The undersigned, if more than one, shall be jointly and severally liable hereunder and all provisions hereof shall apply to each of them.

IN WITNESS WHEREOF, Maker/Debtor has caused these presents to be duly executed, the day and year first above written.
MAKER/DEBTOR/:
**Zaid Carriers LLC**
(Debtor)          (Seal)
By: _____  Manager
                                   (Title)
_____
(Witness to Debtor's Signature)
Address: 1405 Encantado Circle Mission TX, 78572

COPYRIGHT 2017 COMMERCIAL CREDIT GROUP INC.

## AMENDMENT TO
## NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE / CONDITIONAL SALE CONTRACT ("Amendment")

Date: January 03, 2020

WHEREAS, Zaid Carriers LLC as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated September 06, 2018 and payable to the order of **Commercial Credit Group Inc.**, its successors and assigns ("CCG"), with installment payments originally totaling $1,138,620.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Paper is $924,406.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on March 15, 2020 and on the 15th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Paper, as follows:

| | | | |
|---|---|---|---|
| 5 | Installment(s) each in the amount of | $9,949.00 | Followed By |
| 39 | Installment(s) each in the amount of | $18,977.00 | Followed By |
| 1 | Installment(s) each in the amount of | $134,558.00 | |

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Extension had never been entered into. As further consideration for CCG's agreement to the terms of this Extension, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind,, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Paper and/or this Extension, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations. Obligor further acknowledges, warrants and agrees that a first priority security interest in the Property and collateral described in the Paper is and

will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Paper or otherwise.  Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral. Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent. All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained.  Any promissory note made and delivered by Obligor to CCG in connection with this Extension shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG. CCG's agreement to this Extension shall not diminish or prejudice CCG's rights or alter CCG's position under the Paper. Except as expressly modified by this Extension, all terms, conditions and provisions of the Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Paper, the Property or this Extension more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.

IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above

**Commercial Credit Group, Inc.**

By: _____ 
                                    Title

**Zaid Carriers LLC**
**(Obligor)**

By: _____  Manager
                                    Title

DocuSign Envelope ID: 59FC221A-540D-4888-9EAB-8A339CA539D30

This is a copy view of the Authoritative Copy held
by the designated custodian

**SECOND AMENDMENT TO**
**NEGOTIABLE PROMISSORY NOTE AND SECURITY AGREEMENT / LEASE /**
**CONDITIONAL SALE CONTRACT ("Amendment")**

Date: July 02, 2020

WHEREAS, Zaid Carriers LLC   as Obligor, Maker or Lessee ("Obligor") has executed and delivered a certain Negotiable Promissory Note and Security Agreement, Lease or Conditional Sale Contract dated September 06, 2018 and payable to the order of **COMMERCIAL CREDIT GROUP INC.,** its successors and assigns ("CCG"), with installment payments originally totaling $1,138,620.00 (the "Paper"), in which Obligor granted to CCG security interests in and/or Leased certain Collateral described therein (if not separately defined, all capitalized terms herein shall have the same meaning as defined in the Paper) as modified by an Amendment to Negotiable Promissory Note and Security Agreement / Lease / Conditional Sale Contract ("Prior Amendment") dated January 03, 2020(collectively, with the Paper, the "Amended Paper"); and

WHEREAS Obligor has requested, and CCG has agreed, subject to the terms hereof, to amend certain terms of the Amended Paper;

NOW, THEREFORE, for valuable consideration received to their satisfaction, Obligor and CCG mutually agree as follows:

As of the date hereof, and inclusive of the modifications herein, the balance of the total remaining installment payments owed under the Amended Paper is $936,396.00, including fees if any; as of the date hereof Obligor has acknowledged that the amounts set forth herein is absolutely due and owing without defense, offset or counterclaim.

1. Commencing on October 15, 2020 and on the 15th day of each consecutive month thereafter Obligor shall make modified monthly installment payments on the Amended Paper, as follows:

| | | |
|---|---|---|
| 2 | Installment(s) each in the amount of  $9,949.00 | Followed By |
| 6 | Installment(s) each in the amount of  $18,977.00 | Followed By |
| 31 | Installment(s) each in the amount of  $21,551.00 | Followed By |
| 1 | Installment(s) each in the amount of  $134,555.00 | |

2. Except as otherwise specifically provided in this Amendment, the provisions of this Amendment shall be effective upon delivery to CCG of this Amendment bearing the original signatures of Obligor and CCG's acceptance of same.

3. Except as expressly amended hereby, all provisions of the Amended Paper and related documents are ratified and confirmed and shall remain in full force and effect.

4. In consideration of this Amendment, the receipt and sufficiency of which consideration is hereby acknowledged, Obligor hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CCG and its successors, predecessors and assigns, affiliated companies, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Release.

5. As a material inducement, and in consideration, for CCGs agreement to this Amendment, Obligor acknowledges, warrants and agrees that the indebtedness described above is a valid and enforceable obligation of Obligor, due and payable in accordance with its terms without any defense, offset or counterclaim whatsoever, and hereby promises to pay such obligation to the order of CCG in accordance with the payment schedule set forth above, at CCG's office or at such other place of payment as CCG may designate; and in the event of default in the payment of any amount when due, or in the event of a default or any nonperformance under the Amended Paper, the entire unpaid indebtedness shall, at CCG's option, become immediately due and payable, and CCG may enforce all of its rights and remedies under the Paper as fully as if this Amendment and the Prior Amendment had never been entered into.  As further consideration for CCG's agreement to the terms of this Amendment, Obligor hereby assigns, transfers, pledges and grants to CCG a security interest in all accounts, accounts receivable, chattel paper, contract rights, documents, equipment, fixtures, general intangibles, goods, instruments, inventory, securities, deposit accounts, investment property and all other property of whatever nature and kind, wherever located, now owned or hereafter acquired, including, without limitation, all property listed on any schedule to the Amended Paper and/or this Amendment, together with all attachments, accessories, tooling, substitutions, replacements, replacement parts, additions, software and software upgrades and all cash and non-cash proceeds (including rental proceeds, insurance proceeds, accounts and chattel paper arising out of or related to the sale, use, rental or other disposition thereof) of and/or to all of the foregoing, to secure the payment, performance, and fulfillment of all Obligations of Obligor to CCG, whether now existing or hereafter incurred; Obligor authorizes CCG to file a financing statement(s) in all appropriate locations.  Obligor further acknowledges, warrants and agrees that a first priority security interest in the

This is a copy view of the Authoritative Copy h
by the designated custodian

Property and collateral described in the Amended Paper is and will continue to be vested in CCG, its successors and assigns, until Obligor has fully paid and performed all Obligations to CCG, with interest, whether under the Amended Paper or otherwise.  Obligor hereby consents to the use and installation on the Collateral (at CCG's option and Obligor's expense) of global positioning or similar hardware that monitors the location of the Collateral.  Obligor may not remove or disable such hardware without the written consent of CCG. If installed, Obligor shall be responsible for damage to or removal of such hardware without CCG's prior written consent.  All such hardware and information obtained therefrom shall be owned exclusively by CCG and may be disabled or removed from the Collateral by CCG without notice of any kind. The hardware and services it facilitates are for the sole use of CCG and Obligor releases and holds CCG harmless from the use of any such hardware or the information obtained.  Any promissory note made and delivered by Obligor to CCG in connection with this Amendment shall be deemed evidence of the Obligations described herein, and not payment thereof until such time as any such note is fully collected by CCG.  CCG's agreement to this Amendment shall not diminish or prejudice CCG's rights or alter CCG's position under the Amended Paper.  Except as expressly modified by this Amendment, all terms, conditions and provisions of the Amended Paper shall remain valid and binding, enforceable and in full force and effect. Obligor unconditionally and irrevocably stipulates and agrees that Obligor shall have no right to assert any claim or to commence any action or proceeding against CCG as a result of, arising out of, or in any way related to the Amended Paper, the Property or this Amendment more than six (6) months after such claim or cause of action shall accrue.

6. This Amendment shall be construed in accordance with the laws of the State of Delaware, without regard to principles of conflict laws.


IN WITNESS WHEREOF, Obligor and CCG have caused this Amendment to be executed on the date set forth above


**Commercial Credit Group Inc.**

By: Brad Cummins                    AVP – Operations
Brad Cummins                        Title


**Zaid Carriers LLC**
**(Obligor)**

By: Maribel Diaz
Maribel Diaz, Manager

EZ EXT SEC 0320E

# STATE OF MAINE

| VEHICLE ID NUMBER | YEAR | MAKE | MODEL | BODY | TITLE NUMBER |
|---|---|---|---|---|---|
| 1UYVS2536J2130712 | 2018 | UTIL | TL | SE | 14657158 |

| NEW / USED | PURCHASE DATE | ISSUE DATE | PRIOR TITLE | ODOMETER |
|---|---|---|---|---|
| NEW | 08/23/2017 | 10/10/2017 | | |

MAIL TO

COMMERCIAL CREDIT GROUP INC
2135 CITY GATE LANE STE 440
NAPERVILLE, IL 60563

## EXHIBIT A-5

OWNER(S) NAME AND ADDRESS
ZAID CARRIERS LLC
1405 ENCANTADO CIRCLE
MISSION, TX 78572



Secretary of State    Bureau of Motor Vehicles

**FIRST LIENHOLDER**
08/23/2017
COMMERCIAL CREDIT GROUP INC
2135 CITY GATE LANE STE 440
NAPERVILLE, IL 60563

**FIRST RELEASE**
Interest in this vehicle is released by:
Signature
Title                Date

**SECOND LIENHOLDER**

**SECOND RELEASE**
Interest in this vehicle is released by:
Signature
Title                Date

**THIRD LIENHOLDER**

**THIRD RELEASE**
Interest in this vehicle is released by:
Signature
Title                Date

THIS CERTIFICATE IS PRIMA FACIE PROOF OF OWNERSHIP ISSUED IN COMPLIANCE WITH STATE OF MAINE LAW
KEEP IN A SAFE PLACE - NOT IN VEHICLE

L14034130

VOID IF ALTERED

# CERTIFICATE OF TITLE

## STATE OF MAINE

| VEHICLE ID NUMBER | YEAR | MAKE | MODEL | BODY | TITLE NUMBER |
|---|---|---|---|---|---|
| 1UYVS2538AU862201 | 2010 | UTIL | TL | VN | 14823079 |

| NEW / USED | PURCHASE DATE | ISSUE DATE | PRIOR TITLE | ODOMETER |
|---|---|---|---|---|
| USED | 01/24/2018 | 02/26/2018 | 11632688 | |

MAIL TO

**COMMERCIAL CREDIT GROUP INC**
**2135 CITY GATE LANE #440**
**NAPERVILLE, IL  60563**

OWNER(S) NAME AND ADDRESS

**ZAID CARRIERS LLC**
**1405 ENCANTADO CIRCLE**
**MISSION, TX  78572**

 Secretary of State  Bureau of Motor Vehicles

| | FIRST LIENHOLDER | | FIRST RELEASE | |
|---|---|---|---|---|
| | 01/24/2018<br>COMMERCIAL CREDIT GROUP INC<br>2135 CITY GATE LANE #440<br>NAPERVILLE, IL  60563 | | Interest in this vehicle is released by:<br>Signature<br><br>Title          Date | |
| | SECOND LIENHOLDER | | SECOND RELEASE | |
| | | | Interest in this vehicle is released by:<br>Signature<br><br>Title          Date | |
| | THIRD LIENHOLDER | | THIRD RELEASE | |
| | | | Interest in this vehicle is released by:<br>Signature<br><br>Title          Date | |

**THIS CERTIFICATE IS PRIMA FACIE PROOF OF OWNERSHIP ISSUED IN COMPLIANCE WITH STATE OF MAINE LAW**
**KEEP IN A SAFE PLACE - NOT IN VEHICLE**

L14198716

VOID IF ALTERED



Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

6080257100130104040404

0030062

**COMMERCIAL CREDIT GROUP INC**
**2135 CITY GATE LN STE 440**
**NAPERVILLE, IL 60563-3062**

 DETACH HERE

## TEXAS CERTIFICATE OF TITLE

TxDMV

TEXAS DEPARTMENT OF MOTOR VEHICLES

142256741

| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
|---|---|---|---|
| 1XKYD49X4KJ278416 | 2019 | KW | TR |

TITLE/DOCUMENT NUMBER     DATE TITLE ISSUED

**01511143348150042  09/14/2018**

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | |
|---|---|---|---|---|
| 680 | | 18500 | TONLY09 | |

PREVIOUS OWNER

FRENCH ELLISON TRUCK CEN CONVERSE TX

ODOMETER READING

**EXEMPT**

OWNER

**ZAID CARRIERS LLC**
**1405 ENCANTADO CIRCLE**
**MISSION, TX 78572**

REMARK(S)

**DIESEL**

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

| DATE OF LIEN | 1ST LIENHOLDER |
|---|---|
| 09/05/2018 | COMMERCIAL CREDIT GROUP INC |

**2135 CITY GATE LANE SUITE 440**
**NAPERVILLE, IL 60563**

1ST LIEN RELEASED _____ DATE

BY _____
AUTHORIZED AGENT

| DATE OF LIEN | 2ND LIENHOLDER |
|---|---|
| | |

2ND LIEN RELEASED _____ DATE

BY _____
AUTHORIZED AGENT

| DATE OF LIEN | 3RD LIENHOLDER |
|---|---|
| | |

3RD LIEN RELEASED _____ DATE

BY _____
AUTHORIZED AGENT

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

SIGNATURE _____ DATE

**R I G H T S   O F   S U R V I V O R S H I P   A G R E E M E N T**
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

SIGNATURE _____ DATE

SIGNATURE _____ DATE

FORM 30-C REV. 05/2016     DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

Upon sale of this vehicle, the purchaser must apply for a new title within 30 days unless the vehicle is purchased by a dealer. Until a new title is issued, the vehicle record will continue to reflect the owner's name listed on the current title. SEE BACK OF TAB FOR ADDITIONAL INFORMATION.

0
0
2
4
5
9

**COMMERCIAL CREDIT GROUP INC**
**2135 CITY GATE LN STE 440**
**NAPERVILLE, IL 60563-3062**

▼ DETACH HERE ▼

# TEXAS CERTIFICATE OF TITLE

TEXAS DEPARTMENT OF MOTOR VEHICLES

| | | | |
|---|---|---|---|
| VEHICLE IDENTIFICATION NUMBER | YEAR MODEL | MAKE OF VEHICLE | BODY STYLE |
| 1XPXD49X8DD189066 | 2013 | PTRB | TR |

641375442

| TITLE/DOCUMENT NUMBER | DATE TITLE ISSUED |
|---|---|
| 10831743303112728 | 08/01/2018 |

| MODEL | MFG. CAPACITY IN TONS | WEIGHT | LICENSE NUMBER | ODOMETER READING |
|---|---|---|---|---|
| 389 | | 19200 | TONLY07 | EXEMPT |

PREVIOUS OWNER
BORDER TRUCK SALES MCALLEN TX

REMARK(S)
DIESEL

OWNER
ZAID CARRIERS LLC
1405 ENCANTADO CIRCLE
MISSION, TX 78572

X _____
SIGNATURE OF OWNER OR AGENT MUST BE IN INK

UNLESS OTHERWISE AUTHORIZED BY LAW, IT IS A VIOLATION OF STATE LAW TO SIGN THE NAME OF ANOTHER PERSON ON A CERTIFICATE OF TITLE OR OTHERWISE GIVE FALSE INFORMATION ON A CERTIFICATE OF TITLE.

| DATE OF LIEN | 1ST LIENHOLDER | 1ST LIEN RELEASED _____ DATE |
|---|---|---|
| 07/23/2018 | COMMERCIAL CREDIT GROUP INC 2135 CITY GATE LANE SUITE 440 NAPERVILLE, IL 60563 | BY _____ AUTHORIZED AGENT |

| DATE OF LIEN | 2ND LIENHOLDER | 2ND LIEN RELEASED _____ DATE |
|---|---|---|
| | | BY _____ AUTHORIZED AGENT |

| DATE OF LIEN | 3RD LIENHOLDER | 3RD LIEN RELEASED _____ DATE |
|---|---|---|
| | | BY _____ AUTHORIZED AGENT |

IT IS HEREBY CERTIFIED THAT THE PERSON HEREIN NAMED IS THE OWNER OF THE VEHICLE DESCRIBED ABOVE WHICH IS SUBJECT TO THE ABOVE LIENS.

**RIGHTS OF SURVIVORSHIP AGREEMENT**
WE, THE MARRIED PERSONS WHOSE SIGNATURES APPEAR HEREIN, HEREBY AGREE THAT THE OWNERSHIP OF THE VEHICLE DESCRIBED ON THIS CERTIFICATE OF TITLE SHALL FROM THIS DAY FORWARD BE HELD JOINTLY, AND IN THE EVENT OF DEATH OF ANY OF THE PERSONS NAMED IN THE AGREEMENT, THE OWNERSHIP OF THE VEHICLE SHALL VEST IN THE SURVIVOR(S).

| SIGNATURE | DATE |
|---|---|
| SIGNATURE | DATE |
| SIGNATURE | DATE |

FORM 30-C REV. 05/2016          DO NOT ACCEPT TITLE SHOWING ERASURE, ALTERATION, OR MUTILATION.

# STATE OF MAINE

| VEHICLE ID NUMBER | | YEAR | MAKE | MODEL | | BODY | TITLE NUMBER |
|---|---|---|---|---|---|---|---|
| 1UYVS253XBU186111 | | 2011 | UTIL | TL | | RF | 15069015 |
| NEW / USED | PURCHASE DATE | | ISSUE DATE | | PRIOR TITLE | | ODOMETER |
| USED | 07/23/2018 | | 08/27/2018 | | TX | | |

MAIL TO

**COMMERCIAL CREDIT GROUP INC**
**2135 CITY GATE LANE STE 440**
**NAPERVILLE, FL 60563**

OWNER(S) NAME AND ADDRESS
**ZAID CARRIERS LLC**
**1405 ENCANTADO CIRCLE**
**MISSION, TX 78572**

Secretary of State      Bureau of Motor Vehicles

| FIRST LIENHOLDER | 07/23/2018<br>COMMERCIAL CREDIT GROUP INC<br>2135 CITY GATE LANE STE 440<br>NAPERVILLE, FL 60563 | FIRST RELEASE | Interest in this vehicle is released by:<br><br>Signature<br><br>Title                     Date |
|---|---|---|---|
| SECOND LIENHOLDER | | SECOND RELEASE | Interest in this vehicle is released by:<br><br>Signature<br><br>Title                     Date |
| THIRD LIENHOLDER | | THIRD RELEASE | Interest in this vehicle is released by:<br><br>Signature<br><br>Title                     Date |

THIS CERTIFICATE IS PRIMA FACIE PROOF OF OWNERSHIP ISSUED IN COMPLIANCE WITH STATE OF MAINE LAW
KEEP IN A SAFE PLACE - NOT IN VEHICLE

L14452858

VOID IF ALTERED

EXHIBIT B

U.S. Department of Justice
United States Marshals Service

## PROCESS RECEIPT AND RETURN
See "Instructions for Service of Process by U.S. Marshal"

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| COMMERCIAL CREDIT GROUP INC. | 7:22-cv-00083 |
| DEFENDANT | TYPE OF PROCESS |
| ZAID CARRIERS LLC | Writ of Sequestration |

**SERVE AT** { 
NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
Zaid Carriers LLC

ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code)
1708 W Orange Grove Rd., Palmview, Hidalgo County, TX 78574 or wherever the equipment may be found.

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | | |
|---|---|---|
| Jared A. Rougeau, Attorney-In-Charge at txcases@replevinlawfirm.com<br>WRIGHT LAW GROUP, PLLC<br>12333 Sowden Rd, Ste. B, PMB #84356<br>Houston, TX 77080-2059 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | N/A |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (*Include Business and Alternate Addresses,*
*All Telephone Numbers, and Estimated Times Available for Service*):

| Signature of Attorney other Originator requesting service on behalf of: | [X] PLAINTIFF<br>[ ] DEFENDANT | TELEPHONE NUMBER<br>(713) 936-9574 | DATE<br>7/20/2022 |
|---|---|---|---|

### SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE

| I acknowledge receipt for the total number of process indicated. (*Sign only for USM 285 if more than one USM 285 is submitted*) | Total Process | District of Origin No. 79 | District to Serve No. 79 | Signature of Authorized USMS Deputy or Clerk | Date 7-20-22 |
|---|---|---|---|---|---|

I hereby certify and return that I [X] have personally served, [ ] have legal evidence of service, [ ] have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

[ ] I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above (*See remarks below*)

| Name and title of individual served (*if not shown above*)<br>Maribel Diaz | Date<br>7-25-22 | Time<br>5:00 | [ ] am [X] pm |
|---|---|---|---|
| Address (*complete only different than shown above*) | Signature of U.S. Marshal or Deputy<br>#31233<br>David Herrera | | |

*Costs shown on attached USMS Cost Sheet* >>

REMARKS

- Four pieces of large equipment seized as listed in Order For Writ of Sequestration.
- Detailed listing on attached USM-102 form, "Seized Property and Evidence Control".
- U.S.M.S. service fees: $1,235 (19 hrs) + $21.75 (34.8 miles) = $1,256.75

# THE STATE OF TEXAS

## WRIT OF SEQUESTRATION

Case No. 7:22-CV-00083
In the United States District Court For The Southern District of Texas – McAllen Division

Plaintiff: Commercial Credit Group Inc                    Defendant: Zaid Carriers LLC

TO ANY UNITED STATES MARSHALL--GREETING:

YOU ARE HEREBY COMMANDED to take into your possession the following described property, to-wit: ("Equipment")
**(1) 2010 Utility 53' Refrigerated trailer with a Carrier refrigeration unit (S/N: MAB91098566) – VIN: 1UYVS2538AU862201**
**(1) 2018 Utility VS2RA 53' Refrigerated trailer with a Carrier X7300 refrigeration unit (S/N: SAN91514900) – VIN: 1UYVS2536J2130712**
**(1) 2019 Kenworth T680 Cummins X15 450hp engine, Fuller 15810S-EC3 10 speed transmission, Meritor 13.2K#FA, Meritor 40K#RA, 76" raised roof sleeper – VIN: 1XKYD49X4KJ278416**
**(1) 2013 Peterbilt 389 sleeper tractor 70" Ultra sleeper with a with a Cummins 500hp engine, 18 speed transmission and all aluminum wheels. – VIN: 1XPXD49X8DD189066**
**(1) 2011 Utility refrigerated trailer 53' x 102" Refrigerated trailer with a Thermo King SB310 refrigeration unit (S/N: K68748) – VIN: 1UYVS253XBU186111**

**VALUE: $200,000.00;**
LOCATION: **1708 W ORANGE GROVE RD., PALMVIEW, TX  78574, OR WHEREVER IT MAY BE FOUND;**

**JUDGE SIGNING ORDER: RICARDO H. HINOJOSA**
If to be found in your county, and hold the same subject to the future order of the United States District Court For The Southern District of Texas – McAllen Division, in a certain cause therein pending wherein **COMMERCIAL CREDIT GROUP INC. is** Plaintiff and **ZAID CARRIERS LLC is** Defendant.

Unless said Defendant(s), or person(s) from whose possession such property is taken, shall replevy the same according to law.

Herein Fail Not, but have you this writ, with your return thereon, showing how you have executed the same, before the United States District Court For The Southern District of Texas – McAllen Division, to be holden in the Courthouse thereof, in the City of McAllen, Monday at 10:00 o'clock A.M. on the Monday next following the expiration of 20 days from date of service hereof.

**IN ACCORDANCE WITH THE CERTIFIED COPY OF THE ORDER OF THE COURT HERETO ATTACHED**

"To **ZAID CARRIERS LLC,** Defendant:

You are hereby notified that certain properties alleged to be claimed by you have been sequestered. If you claim any rights in such property, you are advised:

*"YOU HAVE A RIGHT TO REGAIN POSSESSION OF THE PROPERTY BY FILING A REPLEVY BOND. YOU HAVE A RIGHT TO SEEK TO REGAIN POSSESSION OF THE PROPERTY BY FILING WITH THE COURT A MOTION TO DISSOLVE THIS WRIT."*

Executed on 7-25-22 @ 5:00pm, Zaid Carriers LLC, 1708 W. Orange Grove Rd. Palmview, TX 78574. Four (4) pieces of large equipment out of five (5) listed in court's Order For Writ of Sequestration were seized and currently in the custody of the U.S. Marshals Service, McAllen Division. Detailed listing of equipment seized on form USM-102, seized Property and Evidence Control attached.

#3/233
David Herrera
Deputy U.S. Marshal
7-26-22

UNCLASSIFIED // LES

**U.S. Department of Justice**
United States Marshals Service

# Seized Property and Evidence Control

INSTRUCTIONS: Use Form USM-102 to record the transfer of seized property from one agency or individual to another. Maintain completed forms in the property file.

**1. DISTRICT:**

Southern District of Texas

**2. RECEIVED FROM (NAME AND ADDRESS):**

Zaid Carriers LLC  1708 W Orange Grove Rd., Palmview, Hidalgo County, TX  78574

| 3. CASE NO.: | 4. CASE TITLE: |
|---|---|
| 7:22-cv-00083 | COMMERCIAL CREDIT GROUP INC.  vs.  ZAID CARRIERS LLC |

**5. SUBJECT (NAME AND ADDRESS):** Maribel Diaz  1708 W. Orange Grove Rd. Palmview, TX 78574

| 6. ITEM NO. | 7. QUANTITY | 8. DESCRIPTION OF ARTICLE *(Include model, serial no., identifying marks, condition, value, etc.)* | 9. STORAGE LOCATION |
|---|---|---|---|
| 1 | 1 | 2019 Kenworth 680 Commercial Tractor | U.S.M.S. custodian |
| | | VIN: 1XKYD49X4KJ278416 | |
| ~~2~~ DA | ~~1~~ DA | ~~2013 Peterbilt 389 Commercial Tractor~~ DA | ~~U.S.M.S. custodian~~ DA |
| | | ~~VIN: 1XPXD49X8DD189066~~ DA | |
| 3 | 1 | 2018 Utility Commercial Trailer (w/ refrigeration unit) | U.S.M.S. custodian |
| | | VIN: 1UYVS2536J2130712 | |
| 4 | 1 | 2011 Utility Commercial Trailer (w/ refrigeration unit) | U.S.M.S. custodian |
| | | VIN: 1UYVS253XBU186111 | |
| 5 | 1 | 2010 Utility Commercial Trailer (w/ refrigeration unit) | U.S.M.S. custodian |
| | | VIN: 1UYVS2538AU862201 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| ADD ITEM |
|---|

Note: Completed forms containing personally identifiable information (PII) must be encrypted and include the appropriate marking (U/LES) in the SUBJECT line of the message prior to dissemination via email.

UNCLASSIFIED // LES

Form USM-102
Rev. 12/17

UNCLASSIFIED // LES

I certify that I have received and hold myself accountable for the articles listed above.

| 10. NAME: David Herrera | 11. TITLE: Deputy U.S. Marshal | 12. AGENCY: U.S.M.S. |
|---|---|---|
| 13. SIGNATURE: | | 14. DATE: 7-25-22 |

## CHAIN OF CUSTODY

| 15. ITEM NO. | 16. DATE | 17. RELINQUISHED BY | 18. RECEIVED BY | 19. PURPOSE |
|---|---|---|---|---|
| 1 | 7/25/22 | NAME & AGENCY: David Herrera  U.S.M.S. SIGNATURE: | NAME & AGENCY: Apple Carlos Arispe Towing SIGNATURE: | U.S.M.S. Custodian |
| 3 | 7/25/22 | NAME & AGENCY: David Herrera  U.S.M.S. SIGNATURE: | NAME & AGENCY: Apple Carlos Arispe Towing SIGNATURE: | U.S.M.S. Custodian |
| 4 | 7/25/22 | NAME & AGENCY: David Herrera  U.S.M.S. SIGNATURE: | NAME & AGENCY: Adan Ray Apple towing SIGNATURE: | U.S.M.S. Custodian |
| 5 | 7/25/22 | NAME & AGENCY: David Herrera  U.S.M.S. SIGNATURE: | NAME & AGENCY: Adan Ray Apple Towing SIGNATURE: | U.S.M.S. Custodian |
| | 7/25/22 | NAME & AGENCY: David Herrera SIGNATURE: | NAME & AGENCY: SIGNATURE: | U.S.M.S. Custodian |
| | | NAME & AGENCY: SIGNATURE: | NAME & AGENCY: SIGNATURE: | |
| | | NAME & AGENCY: SIGNATURE: | NAME & AGENCY: SIGNATURE: | |
| | | NAME & AGENCY: SIGNATURE: | NAME & AGENCY: SIGNATURE: | |
| | | NAME & AGENCY: SIGNATURE: | NAME & AGENCY: SIGNATURE: | |
| | | NAME & AGENCY: SIGNATURE: | NAME & AGENCY: SIGNATURE: | |

ADD ITEM

Note: Completed forms containing personally identifiable information (PII) must be encrypted and include the appropriate marking (U/LES) in the SUBJECT line of the message prior to dissemination via email.

UNCLASSIFIED // LES

Form USM-102
Rev. 12/17

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| COMMERCIAL CREDIT GROUP INC. | 7:22-cv-00083 - 2 |
| DEFENDANT | TYPE OF PROCESS |
| ZAID CARRIERS LLC | Order for Writ of Sequestration |

| | NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN |
|---|---|
| **SERVE AT** | Zaid Carriers LLC |
| | ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code) |
| | 1708 W Orange Grove Rd., Palmview, Hidalgo County, TX 78574 or wherever the equipment may be found. |

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | Number of process to be served with this Form 285 | 1 |
|---|---|---|
| Jared A. Rougeau, Attorney-In-Charge at txcases@replevinlawfirm.com WRIGHT LAW GROUP, PLLC 12333 Sowden Rd, Ste. B, PMB #84356 Houston, TX 77080-2059 | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | N/A |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE *(Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):*

| Signature of Attorney other Originator requesting service on behalf of: | ☒ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER (713) 936-9574 | DATE 7/20/2022 |
|---|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. *(Sign only for USM 285 if more than one USM 285 is submitted)* | Total Process 1 | District of Origin No. 79 | District to Serve No. 79 | Signature of Authorized USMS Deputy or Clerk | Date 7-20-22 |
|---|---|---|---|---|---|

I hereby certify and return that I ☑ have personally served, ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above *(See remarks below)*

| Name and title of individual served *(if not shown above)* | Date 7-25-22 | Time 11:17 | ☑ am ☐ pm |
|---|---|---|---|
| Maribel Diaz (manager) | | | |
| Address *(complete only different than shown above)* | Signature of U.S. Marshal or Deputy D——— #31233 David Herrera | | |

*Costs shown on attached USMS Cost Sheet >>*

REMARKS

U.S.M.S. service fee: $65.00

Form USM-285
Rev. 03/21

EXHIBIT C

U.S. Department of Justice
United States Marshals Service

**PROCESS RECEIPT AND RETURN**
*See "Instructions for Service of Process by U.S. Marshal"*

| PLAINTIFF | COURT CASE NUMBER |
|---|---|
| COMMERCIAL CREDIT GROUP INC. | 7:22-cv-00083 - 3 |

| DEFENDANT | TYPE OF PROCESS |
|---|---|
| ZAID CARRIERS LLC | Summons & Original Complaint |

**SERVE AT**

NAME OF INDIVIDUAL, COMPANY, CORPORATION, ETC. TO SERVE OR DESCRIPTION OF PROPERTY TO SEIZE OR CONDEMN
Zaid Carriers LLC  (registered agent, Rogelio Diaz Jr. or manager, Maribel Diaz)

ADDRESS (Street or RFD, Apartment No., City, State and ZIP Code)
1405 Encantado Circle, Mission, TX 78572

| SEND NOTICE OF SERVICE COPY TO REQUESTER AT NAME AND ADDRESS BELOW | |  |
|---|---|---|
| Jared A. Rougeau, Attorney-In-Charge at txcases@replevinlawfirm.com WRIGHT LAW GROUP, PLLC 12333 Sowden Rd, Ste. B, PMB #84356 Houston, TX 77080-2059 | Number of process to be served with this Form 285 | 1 |
| | Number of parties to be served in this case | 1 |
| | Check for service on U.S.A. | N/A |

SPECIAL INSTRUCTIONS OR OTHER INFORMATION THAT WILL ASSIST IN EXPEDITING SERVICE (Include Business and Alternate Addresses, All Telephone Numbers, and Estimated Times Available for Service):

anywhere else they may be found

| Signature of Attorney other Originator requesting service on behalf of: | ☒ PLAINTIFF ☐ DEFENDANT | TELEPHONE NUMBER (713) 936-9574 | DATE 7/20/2022 |
|---|---|---|---|

**SPACE BELOW FOR USE OF U.S. MARSHAL ONLY - DO NOT WRITE BELOW THIS LINE**

| I acknowledge receipt for the total number of process indicated. (Sign only for USM 285 if more than one USM 285 is submitted) | Total Process 1 | District of Origin No 79 | District to Serve No 79 | Signature of Authorized USMS Deputy or Clerk | Date 7-20-22 |
|---|---|---|---|---|---|

I hereby certify and return that I ☒ have personally served , ☐ have legal evidence of service, ☐ have executed as shown in "Remarks", the process described on the individual, company, corporation, etc., at the address shown above on the on the individual, company, corporation, etc. shown at the address inserted below.

☐ I hereby certify and return that I am unable to locate the individual, company, corporation, etc. named above (See remarks below)

| Name and title of individual served (if not shown above) Maribel Diaz (manager) | Date 7-25-22 | Time 10:33 | ☒ am ☐ pm |
|---|---|---|---|
| Address (complete only different than shown above) 2410 E Expressway 83 Mission, TX 78572   (Walmart parking lot) | Signature of U.S. Marshal or Deputy #31233 David Herrera | | |

*Costs shown on attached USMS Cost Sheet >>*

REMARKS

U.S.M.S. service fee: $65.00 + $5.75 (9.2 miles) = $70.75

Form USM-285
Rev. 03/21

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the
### Southern District of Texas

| | |
|---|---|
| Commercial Credit Group Inc. | ) <br> ) <br> ) <br> ) <br> ) |
| *Plaintiff(s)* | ) |
| v. | )    Civil Action No.  7:22-cv-00083 |
| Zaid Carriers LLC | ) <br> ) <br> ) <br> ) |
| *Defendant(s)* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  Zaid Carriers LLC
                       Registered Agent: Rogelio Diaz Jr.
                       1405 Encantado Circle
                       Mission, TX 78572

        A lawsuit has been filed against you.

        Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:     Jared A. Rougeau, Attorney-In-Charge
                                     jar@replevin.com
                                     WRIGHT LAW GROUP, PLLC
                                     12333 Sowden Rd, Ste. B, PMB #84356
                                     Houston, TX 77080-2059

        If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

                                                   *Nathan Ochsner, Clerk of Court*

Date: June 15, 2022                                                 *s/ Jennifer Nogueira*
                                                   *Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No. 7:22-cv-00083

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)*          Zaid Carriers LLC

was received by me on *(date)*          July 20, 2022          .

❑ I personally served the summons on the individual at *(place)*

_____ on *(date)* _____ ; or

❑ I left the summons at the individual's residence or usual place of abode with *(name)*

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☑ I served the summons on *(name of individual)*          Maribel Diaz (manger)          , who is

designated by law to accept service of process on behalf of *(name of organization)*          Zaid Carriers LLC

on *(date)*          July 25, 2022          ; or

❑ I returned the summons unexecuted because _____ ; or

❑ Other *(specify):*


My fees are $          5.75          for travel and $          65.00          for services, for a total of $          *70.75*          .

I declare under penalty of perjury that this information is true.

Date:          July 26, 2022

_____
*Server's signature*

David Herrera, DUSM
*Printed name and title*

1701 W Business Highway 83
Ste 1125
McAllen, TX 78501
*Server's address*

Additional information regarding attempted service, etc:

EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | | |
|---|---|---|
| **COMMERCIAL CREDIT GROUP INC.** | § | |
| **Plaintiff** | § | **Civil Action No. 7:22-cv-00083** |
| | § | |
| **vs.** | § | |
| | § | |
| **ZAID CARRIERS LLC** | § | |
| **Defendant** | § | |

<u>NON-MILITARY STATUS AFFIDAVIT</u>

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared, Jared A. Rougeau, who after being duly sworn, stated upon oath as follows:

1.   "My name is Jared A. Rougeau. I am attorney of record for the plaintiff in the above entitled and numbered action. I am of sound mind, capable of making this affidavit and have personal knowledge of the true and correct facts stated herein."

2.   "After a review of the records related to this case and my involvement in this case, I have determined that the defendant was not in military service when this suit was filed or at any time since then and the defendant is not now in military service of the United States of America. In support of defendant's nonmilitary status, attached hereto is a true and correct copy of Military Status Report issued by the United States Department of Defense Manpower Data Center for each individual defendant."

Jared A. Rougeau

SUBSCRIBED AND SWORN TO Before me on October 12, 2022.

Nicole Rougeau
Notary Public, State of Texas
Comm. Expires 06/01/2023
Notary ID 130245643

Notary Public in and for the State of Texas